LOHSE PATENT DOOR COMPANY, Appellant, v. REINHARD FUELLE et al.

Division One, December 23, 1908.

1. **MONOPOLY: Personal Service.** At common law, personal service—an occupation—could not be the subject of a monopoly; and while labor organizations might be proper subjects of legislative control and regulation, the General Assembly of Missouri has not prescribed such control and regulation.

2. ———: ———: **Labor Organizations: Quitting Work: Injunction.** Individuals have a legal right to form labor organizations for the protection and promotion of the interests of the laboring classes, and the courts have no power to enjoin the members of such organizations from peaceably withdrawing from the service of their employer.

3. ———: ———: ———: **Combinations.** A brotherhood of carpenters and joiners and their allied associations do not constitute an unlawful combination in restraint of trade, if confined within proper bounds.

4. **BOYCOTT: Labor Organization.** A boycott carried on by a carpenters' and joiners' union, through its executive officers, having for its purpose and end the intimidation of contractors and builders 'from purchasing and using in any building to be constructed by them, building material manufactured by the plaintiff in the conduct of its planing mill, by prohibiting the carpenters and joiners belonging to the union from work-

ing on any and all buildings in which plaintiff's materials are being used or to be used, is a conspiracy and an unlawful combination to injure plaintiff—the purpose of the boycott being to compel plaintiff, by this indirect interference with its beneficial business, to discharge all its non-union laborers.

5. ———: ———: Injunction: Pleading: Demurrer. And a demurrer to a petition that charges those necessary elements of a boycott, while it does not admit the conclusion of law that it is unlawful, admits all the allegations of fact well pleaded, and if they together amount to a charge of an unlawful conspiracy to injure the trade, business or occupation of plaintiff, the petition states a cause of action for injunctive relief.

6. ———: Definition. This definition by the Supreme Court of Minnesota, in Gray v. Building Trades Council, 91 Minn. l. c. 179, is accepted: "A boycott is a combination of several persons to cause a loss to a third person by causing others against their will to withdraw from him their beneficial business intercourse through threats that, unless a compliance with their demands be made, the persons forming the combination will cause loss or injury to him; or an organization formed to exclude a person from business relations with others by persuasion, intimidation, and other acts, which tend to violence, and thereby cause him through fear of resulting injury to submit to dictation in the management of his affairs." Such acts constitute a conspiracy, and may be restrained by injunction.

7. ———: Unlawful Conspiracy: Injunction. A combination to injure or destroy the trade, business or occupation of another by threatening or producing injury to the trade, occupation or business of those who have business relations with him, is an unlawful conspiracy, regardless of the name by which it is known, and can be restrained by injunction.

8. PROPERTY: Occupation. A person's occupation or calling, by means of which he earns a livelihood and endeavors to better his condition, and to provide for and support himself and those dependent upon him, is property within the meaning of the law, and entitled to protection as such; and as conducted by the merchant, capitalist, contractor or laborer, is, aside from the goods, chattels, money or effects employed or used in connection therewith, property in every sense of the word.

9. BOYCOTT: Threats: Injunction. To prohibit a labor union and its executive officers from continuing in force a boycott theretofore declared, or to enjoin them to declare a threatened boycott against plaintiff's business, plaintiff is entitled to injunction.

10. ———: To Discharge Non-Union Men. Combinations between the officers and members of a labor union, or between

such union and its executive officers and kindred associations, having for its direct object the immediate effect to injure and damage the business of persons at whom they are directed, and thereby to compel them to discharge their non-union employees and replace them with members of the union, and thereby incidentally and indirectly to benefit the parties to the combination, is an unlawful conspiracy.

Appeal from St. Louis City Circuit Court.—*Hon Warwick Hough*, Judge.

REVERSED AND REMANDED.

*W. M. Williams, Block & Sullivan, George S. Johnson* and *Herbert R. Marlatt* for appellant.

(1) The acts of respondents in combining to coerce appellants to unionize their mills and discharge their non-union employees, the same to be enforced by compelling appellants' customers to withdraw patronage from appellants, under threats of loss and damage to the business of appellants' customers, constitute an illegal conspiracy and a boycott; a court of equity will enjoin such a boycott and the means used to enforce it, without violating any constitutional right of free speech or freedom to publish. (a) A combination to injure or destroy the trade, business or occupation of another by threatening or producing injury to the trade, business or occupation of those who have business relations with him, is an indictable conspiracy at common law. Callan v. Wilson, 127 U. S. 540; State v. Donaldson, 32 N. J. L. 151; State v. Glidden, 55 Conn. 46; State v. Stewart, 59 Vt. 273; Com. v. Shelton, 11 Va. L. J. 324; Crump v. Com., 84 Va. 927; People v. Wilzig, 4 N. Y. Cr. Rep. 403. (b) A conspiracy to deprive non-union men of employment and compel their discharge is illegal. Beck v. Teamsters' Union, 118 Mich. 497; Brace v. Evans (Pa.), 3 Ry. & Corp. L. J. 561; Erdman v. Mitchell, 207 Pa. St. 79; Purvis v. United Brotherhood, 214 Pa.

St. 348; State v. Donaldson, 32 N. J. L. 151; Brennan v. United Hatters, 73 N. J. L. 729; Glass Co. v. Blowers' Assn., 66 Atl. 953; Luecke v. Clothing Cutters, 77 Md. 396; Plant v. Woods, 179 Mass. 492; Quinn v. Leathem, A. C. (1901) 495; Giblan v. Union (1903), 2 Q. B. 600; Casey v. Typographical Union, 45 Fed. 135; Berry v. Donovan, 188 Mass. 353; Pickett v. Walsh, 192 Mass. 572; Tel. Co. v. Kent, 156 Fed. 173; Crump v. Com., 84 Va. 927; State v. Glidden, 55 Conn. 46; Curran v. Galen, 152 N. Y. 33. (c) A combination to deprive one of his right to conduct his business, except on conditions imposed by the combination, is illegal. Loewe v. Lawlor, 28 Sup. Ct. Rep. 303; Temperton v. Russell (1893), 1 Q. B. 715; Quinn v. Leathem, A. C. (1901), 495; Brace v. Evans, 3 Ry. & Corp. L. J. 561; Purvis v. United Brotherhood, 214 Pa. St. 348; Beck v. Teamsters' Union, 118 Mich. 497; My Maryland Lodge v. Adt, 100 Md. 238; Barnes v. Union, 83 N. E. 932; Wilson v. Hay, 83 N. E. 928; Barr v. Trades Council, 53 N. J. Eq. 101; Martin v. McFall, 65 Id. 92; Glass Co. v. Blowers' Assn., 66 Atl. 953; Casey v. Typographical Union, 45 Fed. 135; Loewe v. Federation, 139 Fed. 71; Seattle Brewing Co. v. Hansen, 144 Fed. 1011; Hopkins v. Oxley Stave Co., 83 Id. 912; Carew v. Rutherford, 106 Mass. 1; Tel. Co. v. Kent, 156 Fed. 173; Tel. Co. v. Federation, 156 Fed. 809. (d) The combination mentioned under points (b) and (c) are none the less illegal because the coercion to to be exercised is: 1. The withdrawal of members of trades unions from the service of those through the cessation of whose business intercourse with plaintiff the purpose aimed at is to be attained. Quinn v. Leathem, A. C. (1901) 495; Temperton v. Russell (1893), 1 Q. B. 715; Giblan v. Union (1903), 2 Q. B. 600; Erdman v. Mitchell, 207 Pa. St. 79; Purvis v. Brotherhood, 214 Pa. St. 348; Luecke v. Clothing Cutters, 77 Md. 396; Piano Workers v. Supply Co., 124 Ill. App. 354; Barnes v. Union, 83 N. E. 932; Brennan

v. Hatters' Union, 73 N. J. L. 729; State v. Donaldson, 32 N. J. L. 151; Moores v. Union, 23 Wk. L. B. (Ohio) 48; Thomas v. Railroad, 62 Fed. 803; Railroad v. Railroad, 54 Id. 730; Carew v. Rutherford, 106 Mass. 1; Plant v. Woods, 179 Id. 492; Berry v. Donovan, 188 Id. 353; Pickett v. Walsh, 192 Id. 572; Const. Co. v. Cameron, 88 N. E. (Mass.) 478; March v. Bricklayers' Union, 79 Conn. 7; State v. Stewart, 59 Vt. 273; Allis Chalmers v. Union, 150 Fed. 155; Curran v. Galen, 152 N. Y. 33; Beattie v. Callanan, 81 N. Y. Supp. 415; Railroad v. Hannahan, 121 Fed. 564; Shine v. Fox Bros. Manufacturing Co., 156 Fed. 357; Burke v. Fay, 107 S. W. 408. Contra: Gray v. Trades Council, 91 Minn. 171. 2. By the withdrawal of patronage of members of the association from those whose conduct is to be controlled or from their customers. Tel. Co. v. Federation, 156 Fed. 809; Loewe v. Lawlor, 28 Sup. Ct. Rep. 303; Beck v. Teamsters' Union, 118 Mich. 497; Luecke v. Clothing Cutters, 77 Md. 396; My Maryland Lodge v. Adt, 100 Md. 238; Wilson v. Hay, 83 N. E. 928; Brown v. Pharmacy Co., 115 Ga. 429; Barr v. Trades Council, 53 N. J. Eq. 101; Glass Co. v. Bottle Blowers' Union, 66 Atl. 953; Casey v. Typographical Union, 45 Fed. 135; Jordahl v. Hayda, 82 Pac. 1079; Goldberg v. Union, 149 Cal. 429; Loewe v. Federation, 139 Fed. 71; Brewing Co. v. Hansen, 144 Fed. 1011; Oxley Stave Co. v. Union, 72 Fed. 695; Hopkins v. Oxley Stave Co., 83 Fed. 912; Tel. Co. v. Kent, 156 Fed. 173; Crump v. Com., 84 Va. 927; State v. Glidden, 55 Conn. 46; Ertz v. Produce Exchange, 79 Minn. 140; Printing Co. v. Howell, 26 Ore. 527; Jackson v. Stanfield, 137 Ind. 592; Stove Co. v. Federation, 35 Wash. L. R. 797; Boutwell v. Marr, 71 Vt. 1; Martell v. White, 185 Mass. 255; Gatzow v. Buenning, 106 Wis. 1; Delz v. Winifree, 88 Tex. 400; Olive v. Van Patton, 7 Tex. Civ. App. 630; Klinge's Pharmacy v. Sharp, 104 Md. 218. Contra: Bohn Mfg. Co. v. Hollis, 54 Minn. 233. (e) A court of equity

will enjoin that species of combination and conspiracy known as a boycott. Tel. Co. v. Federation, 156 Fed. 809; Giblan v. Union (1903), 2 Q. B. 600; Brace v. Evans, 3 Ry. & Corp. L. J. 562; Erdman v. Mitchell, 207 Pa. St. 79; Purvis v. United Brotherhood, 214 Pa. St. 348; Beck v. Teamsters' Union, 118 Mich. 497; My Maryland Lodge v. Adt, 100 Md. 238; Piano Assn. v. Supply Co., 124 Ill. App. 354; Barnes v. Union, 83 N. E. 939; Wilson v. Hay, 83 N. E. 928; Brown v. Pharmacy Co., 115 Ga. 429; Barr v. Trades Council, 53 N. J. Eq. 101; Martin v. McFall, 65 N. J. Eq. 92; Glass Co. v. Assn., 66 Atl. 953; Casey v. Typographical Union, 45 Fed. 135; Railroad v. Railroad, 54 Fed. 730; Thomas v. Railroad, 62 Fed. 803; Jordahl v. Hayda, 82 Pac. 1079; Goldgerg v. Union Co., 149 Cal. 429; Loewe v. Federation, 139 Fed. 71; Brewing Co. v. Hansen, 144 Fed. 1011; Oxley Stave Co. v. Union, 72 Fed. 695; Hopkins v. Oxley Stave Co., 83 Fed. 912; Sherry v. Perkins, 147 Mass. 212; Vegelahan v. Gunter, 167 Mass. 93; Plant v. Woods, 179 Mass. 492; Pickett v. Walsh, 192 Mass. 572; Const. Co. v. Cameron, 88 N. E. 478; Tel. Co. v. Kent, 156 Fed. 173; Gray v. Trades Council, 91 Minn. 171; Printing Co. v. Howell, 26 Ore. 527; Allis Chalmers v. Union, 150 Fed. 155; Beattie v. Callanan, 81 N. Y. Supp. 414; Railroad v. Hannahan, 121 Fed. 564; Shine v. Fox Bros. Mfg. Co., 156 Fed. 367; Jackson v. Stanfield, 137 Ind. 592; Stove Co. v. Federation, 35 Wash. L. R. 797. Contra: Clothing Co. v. Watson, 168 Mo. 146. (f) The constitutional provision relative to the right of free speech and publication does not prevent a court of equity from enjoining a boycott. The adjudicated cases are to the contrary. Cases supra, under point (e). This provision of the Constitution was adopted for an altogether different purpose. Cooley Const. Lim. (7 Ed.), 604; 2 Kent's Com. (14 Ed.), 18. The Missouri cases hold that speech or publication, designed to injure the property rights or business of another, may be enjoined where the

remedy at law is inadequate. Filley v. Fassett, 44 Mo. 168; McCartney v. Garnhart, 45 Id. 593; Liggett v. Tob. Co., 104 Id. 53; Oakes v. Candy Co., 146 Id. 391; Nicholson v. Cigar Co., 158 Id. 158; Sanders v. Utt, 16 Mo. App. 322; McCann v. Anthony, 21 Id. 83; Brewing Co. v. Brewing Co., 47 Id. 14; Gaines v. Grocer Co., 107 Id. 507; Shelly v. Sperry, 121 Id. 438; Flint v. Smoke Burner Co., 110 Mo. 493; Shoe Co. v. Saxey, 130 Id. 212. (2) The conspiracy between respondents to compel appellants to give up control of their business and discharge their non-union employees—the combination and concert of action between respondents to effect this illegal purpose—was itself an illegal act independent of the illegal means to accomplish the purpose, and that conspiracy itself will be enjoined by a court of equity. Loewe v. Lawlor, 28 Sup. Ct. Rep. 301; Hopkins v. Stave Co., 83 Fed. 912; Thomas v. Railroad, 62 Fed. 803; Purvis v. Brotherhood, 214 Pa. St. 348; Pickett v. Walsh, 192 Mass. 572; Loewe v. Federation, 139 Fed. 71; Casey v. Union, 45 Fed. 135; Arthur v. Oakes, 63 Fed. 310; Allis Chalmers v. Union, 150 Fed. 155; Quinn v. Leathem, A. C. (1901) 495; Railroad v. Railroad, 54 Fed. 730; Erdman v. Mitchell, 207 Pa. St. 79; Shine v. Mfg. Co., 156 Fed. 357; Beck v. Teamsters' Union, 118 Mich. 497; My Maryland Lodge v. Adt, 100 Md. 238; State v. Glidden, 55 Conn. 46; Giblan v. Union, 2 K. B. (1903) 618; Berry v. Donovan, 188 Mass. 353; State v. Stewart, 59 Vt. 273; Brewing Co. v. Hansen, 144 Fed. 1011; Vegelhan v. Guntner, 167 Mass. 92; Stove Co. v. Federation, 35 Wash. L. R. 797; Brown v. Pharmacy Co., 115 Ga. 429.

*Jno. B. Dempsey* for respondents.

(1) There is no monopoly or combination in restraint of trade in the allegations of the petitions. The rendition of personal services is not contemplated as

one of the things sought to be controlled by the statute. R. S. 1899, sec. 8978; State ex rel. v. Associated Press, 159 Mo. 456. And if there is such a combination as the law prohibits, plaintiff is not the proper party to set the machinery of the law in motion. People v. Tobacco Mfg. Co., 42 How. Pr. 162; Hunt v. Chicago, 20 Ill. App. 282; Atty.-Gen. v. Detroit, 26 Mich. 263. And authority to file information in equity to restrain and prevent a public wrong is well established in England. It may be done by the Attorney-General, *ex officio,* or upon the relation of persons who have an interest in the subject-matter of the bill, and whose private rights may be protected by a decree which is sought mainly on the ground of a public injury. Kerrison v. Sparrow, Coop. (1837) 305; Atty.-Gen. v. Johnson, 2 Willes Ch. 87; Atty.-Gen. v. Forbes, 2 Mylne & Keen 129. (2) "Courts have invariably upheld the right of individuals to form labor organizations for the protection of the interests of the laboring classes and denied the power to enjoin the members of such associations from withdrawing peaceably from any service, whether singly or in a body, even where such withdrawal involves a breach of contract." Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 310; National Protective Assn. v. Cumming, 170 N. Y. 315; Bowen v. Matheson, 14 Allen 499; Master Stevedores' Assn. v. Walsh, 2 Daly 10; Murdock v. Walker, 152 Pa. St. 595; Gray v. Building Trades Council, 91 Minn. 171; Thomas v. Railroad, 62 Fed. 803; Railroad v. Hannahan, 121 Fed. 563; Ames v. Railroad, 62 Fed. 7; Railroad v. Gee, 140 Fed. 153; Mills v. Printing Co., 91 N. Y. Supp. 185. (3) One may lawfully threaten to do what he has a legal right to do, and a labor organization is endowed with precisely the same legal right as is an individual to threaten to do what it may lawfully do. Boyer v. W. U. Tel. Co., 124 Fed. 246; National Protective Assn. v. Cumming, 170 N. Y. 315; State v. Van Pelt, 136 N. C. 633; Commonwealth v.

Hunt, 4 Metc. 134. Even if defendants' acts have caused loss to plaintiff, it is *damnum absque injuria.* Boyer v. W. U. Tel. Co., 124 Fed. 246; McCaulay v. Tierney, 19 R. I. 255; Snow v. Wheeler, 113 Mass. 179; Bowen v. Matheson, 14 Allen 499; Hunt v. Simonds, 19 Mo. 588; People v. Kotska, 4 N. Y. Cr. Rep. 429; Foster v. Retail Clerks Assn., 78 N. Y. Supp. 48. (4) Having the right, then, to organize to quit our employment at any time for any reason, but especially where by so doing the workmen hope to better their condition, and having these rights, we have also the right to declare our intention to exercise them, these rights are not abridged in any wise by reason of the fact that others may be injured in consequence. Gray v. Building Trades, 91 Minn. 171; My Maryland Lodge v. Adt, 100 Md. 238; National Protective Assn. v. Cummings, 170 N. Y. 315; Bohn Mfg. Co. v. Hallis, 54 Minn. 223; Commonwealth v. Hunt, 4 Metc. 111; Carew v. Rutherford, 106 Mass. 1. (5) Defendants have also the right to contract with their employers for exclusive service or exclusive dealings. Carnig v. Carr, 167 Mass. 544; Harrison v. Glucose Co., 116 Fed. 304; Brown v. Ronnsavell, 78 Ill. 589; Jacobs v. Cohen (N. Y.), 2 L. R. A. (N. S.) 292; Ellerman v. Railroad, 49 N. J. Eq. 252; Railroad v. Railroad, 171 Pa. 299; Ferris v. American Brewing Co., 155 Ind. 539. (6) And the right of the individual is equally a right when exercised by any number acting together for their own advantage. Randall v. Hazleton, 94 Mass. 412; Bowen v. Mathewson, 96 Mass. 499; Van Horn v. Van Horn, 52 N. J. L. 284; Moores v. Union, 23 Ohio Law Bull. 48; Delz v. Winfill, 80 Tex. 400; Bohn Mfg. Co. v. Hollis, 54 Minn. 223; Butterick v. Typographical Union No. 6, 100 N. Y. Supp. 292; Orr v. Ins. Co., 12 La. Ann. 255. (7) A threat of an employer to discharge his workmen unless they withdraw their patronage from traders and others who have for some reason incurred the employer's displeasure is not ac-

tionable at law or in equity. Roycroft v. Tainter, 68 Vt. 219; Heywood v. Tilson, 75 Me. 225; Payne v. Railroad, 13 Lea (Tenn.) 507; Bowen v. Mathewson, 96 Mass. 499. (8) In the following cases injunctions were denied to plaintiffs seeking to restrain employees from refusing to work and from peaceably persuading others to aid them: Rogers v. Evarts, 17 N. Y. Supp. 264; Railroad v. Hannahan, 121 Fed. 563; Johnston Harvester Co. v. Meinhardt, 60 How. Pr. 168; Davis v. United Hoisting Engineers, 28 App. Div. (N. Y.) 396; Longshoremen v. Howell, 26 Ore. 527. (9) Injunctions denied to enjoin tradesmen from threatening to refuse to deal with persons with or without malice—such acts held lawful and *dammum absque injuria*. Hunt v. Simonds, 19 Mo. 583; London Guaranty Co. v. Horn, 206 Ill. 493; Orr v. Ins. Co., 12 La. Ann. 255; Bowen v. Mathewson, 96 Mass. 499. Relief denied to employees who are threatened with discharge unless they withdraw trade relations with persons obnoxious to the employer. Roycroff v. Tainter, 68 Vt. 219; Heywood v. Tilson, 75 Me. 225; Payne v. Railroad, 13 Lea (Tenn.) 507.

WOODSON, J.—This suit had its origin in the circuit court of the city of St. Louis, the object of which is to enjoin the defendants from declaring and prosecuting a boycott against the appellant and its business.

Defendants demurred to the petition, which was by the court sustained. Plaintiff declined to plead further, and the court entered final judgment for defendants, and, in due time, plaintiff appealed the cause to this court.

As counsel for the respective parties do not agree upon just what the petition charges, it will be necessary to set it out *in haec verba*. Omitting the formal parts, it reads as follows:

"The plaintiff, Lohse Patent Door Company, a corporation organized under the laws of the State of Missouri, files this its amended petition herein by leave of court, and alleges that it is and was at all times hereinafter mentioned engaged in the planing-mill business in the city of St. Louis, Missouri, to-wit, in the manufacture and sale of sashes, doors, blinds and woodwork of all kinds for use in the erection of buildings, and also in the manufacture and sale of cabinet and kindred lines of woodwork. And plaintiff avers that during all the time that it has been so engaged in said line of business in the city of St. Louis it has enjoyed, and now enjoys, a large and profitable trade and business among builders and contractors for and upon building in the city of St. Louis and vicinity, exceeding in amount $50,000 yearly; that during all of that time it has been necessary for plaintiff to employ, and it has at all times so employed, and now employs, large numbers of skilled artisans in woodwork in the production of the articles and things which plaintiff manufactures and deals in, as above set forth, and it is necessary and essential to the continued and successful operation of the business of the plaintiff that it should continue to so employ such skilled labor. And plaintiff avers that at all times hereinafter mentioned and set forth, the employees of plaintiff were satisfied with the terms of their employment, the hours of their labor, and with the compensation paid to them by plaintiff for their services; that none of the employees of plaintiff herein were, at any of the times hereinafter mentioned, complaining of the nature of their employment, nor claiming any grievances or seeking any redress of any sort or nature in connection with their said employment, nor were they desirous, so far as plaintiff is advised, of becoming associated with the United Brotherhood of Carpenters and Joiners, hereinafter mentioned and referred to, or of any local lodge thereof, nor were they seeking any aid

or assistance from defendants with reference to their employment.

"Plaintiff further states that the United Brotherhood of Carpenters and Joiners of America in St. Louis, is an association and organization consisting of numerous members, the idenity of whom (except as shall be hereinafter set forth) is now unknown to the plaintiff, and whose membership consists of persons engaged in industry as carpenters and joiners and wood-workmen, and is composed in part of wood-workmen engaged in the same line of occupation and employment as that which the character of the business of the plaintiff makes it necessary that it should enjoy.

"Plaintiff avers that the United Brotherhood of Carpenters and Joiners, in the city of St. Louis, is a trust, an illegal association and combination, and that said association and organization is against public policy and contrary to law, in this, to-wit: That it is contrived and intended and designed to create, for and in behalf of the members thereof in that particular line of industry, a monopoly, and to hinder and prevent others in the same line of industry but not members of said association from obtaining employment, and to stifle and destroy competition in that particular line of employment; to fix and maintain, by agreement among the members of said association and by the use of arbitrary methods, the price to be paid persons for services in that line of industry, and to fix and regulate the amount of labor which persons in that line of industry shall return for a specified consideration, and to restrict the supply of labor in that line by restraining the number of apprentices or persons learning the trade which any particular artisan may employ; and to hinder and prevent persons and corporations, engaged in such a business as necessitates the employment by them of artisans of the class and doing the character of work of those belonging to said

association, from employing, for the performance of such work, any person or persons not a member or members of said association; and to hinder and prevent this plaintiff, and others engaged in the manufacture of similar articles, from employing, in the production thereof, artisans except such as are members of said association; and to hinder and prevent contractors and builders, and others whose business requires the use of materials such as are produced by the plaintiff, from procuring the same from this plaintiff or any other person, firm or corporation who or which, in the production of such articles, employ artisans of the class and kind such as compose said association, but who are not members thereof, and to hinder and prevent such contractors and builders from employing any person in the same line of industry but not members of such association; and to create a monopoly, to be enjoyed by the members of said association in the lines of industry hereinbefore set forth, and to destroy all competition therein, and to destroy and take away the business of all persons, firms or corporations employing artisans of the same class but not members of the association.

"And plaintiff states that by and under the terms and rules of said organization, the controlling and governmental body thereof is what is known as the 'Carpenters' District Council;' of which the defendant, Reinhard Fuelle, is president, and the defendant, George C. Newman, is secretary, and which body is composed of said two defendants and the other defendants and other persons whose identity is unknown to plaintiff herein; and that defendants herein are what is known as business agents of said association, and are the active representatives, agents and officers of said association and of said Carpenters' District Council; that said Carpenters' District Council, so composed, is, by the scheme of said association,

.authorized and empowered to, and does, approve rules and regulations for the government of the entire association and all of the members thereof, and which rules and regulations, so fixed, each member is called upon and required, by the rules of said association, to obey, and which said members do obey.

"That there have been promulgated by said association and approved by said District Council rules for the control of the members thereof, by which it is provided that no member thereof shall work at his trade for a longer number of hours per day than that prescribed by the District Council without the payment of extra compensation fixed by said District Council for such extra time, and that no members shall work upon holidays without the payment of such extra compensation so fixed, and upon certain holidays and other days not holidays, that no member shall do any labor; that no member shall work for wages or compensation fixed by the amount of work performed, but only and always must work on a time basis; that no member shall work for less than the rate of wage prescribed and fixed by said District Council without the special approval and consent of said District Council, and that the representatives of said District Council and of said association may, at any time, at their pleasure, examine into the wages being received by the individual member and ascertain whether or not said member is receiving at least the wages fixed and determined by said District Council, and that each member shall be provided with a working card when in good standing in the order, to be issued to him by said District Council, and that he shall not be allowed to accept employment or perform services for any person or under any terms except when holding such a card, and that no member shall employ more than one apprentice, the purpose thereof being to restrict the number of persons who may learn the trade of the members of said association and thus come in competition with them;

that when a person not a member of said association shall be employed to perform services, or shall desire to perform services similar to the occupation of members of said association, he shall apply for membership in said association, otherwise he shall not be allowed to work at such trade or occupation, nor shall any member of the association be permitted to work at such trade or occupation with him, and the agents and representatives of said District Council and of said association are at all times authorized and empowered whenever in their or either of their judgment any of the rules and regulations aforesaid, promulgated by said District Council, are being violated, and especially whenever it appears to them or either of them, that members of the association are working in conjunction with others not members or are receiving wages less than those prescribed by said rules and regulations or are working on or with materials produced by any person, firm or corporation employing others than members of said association in the same line of trade and occupation, to immediately require all members of such association engaged in connection with the particular work upon or about which such conditions exist, to immediately and at once cease to carry on said work; and it is made the duty of each and every member of said association to obey this requirement; and it is provided by said rules and regulations that all of said rules are to be enforced upon and against the members thereof, and obedience by them to such rules is enforced by a series of fines and penalties levied by said Carpenters' District Council upon the members and by a forfeiture of his membership, so that plaintiff says by the terms of the organization of said association it has been placed in the power of the defendants, and their associates aforesaid as composing said District Council, and the business agents of said association, to immediately require and cause any and all members of said association to at once decline and

refuse to perform services for customers of the plaintiff and for contractors, builders and other persons who may buy materials from any persons, firm or corporation using in the production thereof the services of others than members of said association.

"And plaintiff says that said association and said Carpenters' District Council, and said business agents acting therefor, are associated and affiliated with similar associations of other persons engaged in other lines connected with the building industry, the object and purpose of which associations are the same as the object and purpose of said United Brotherhood of Carpenters and Joiners, as hereinbefore set forth, and having officers and agents having and exercising the same authority over their several and respective members as are had and exercised over said Carpenters and Joiners Association by said District Council, and that they act together in support of each other, and so acting together it is within the power of said District Council and said business agents to exercise the same authority over the members of said affiliated associations through their respective governing bodies.

"Plaintiff states that there has been entrusted to said Carpenters' District Council, and to said business agents, the furtherance of the purposes for which said association was founded, to-wit: The creation of a monopoly in that branch of trade and labor in behalf of the members of said association, and that defendants and their unknown associates are now actively and earnestly engaged in carrying out said purpose by the use of every means known to them.

"Plaintiff states that in the past year representatives of the defendants, as such Carpenters' District Council, and said business agents, have communicated with the plaintiff and have required of it that it should have its employees become members of said association, and that it should decline and refuse to employ any person or persons in the furtherance of its business

hereinbefore described who was not a member of said
association, and that plaintiff should permit defend-
ants and their associates, and said association and its
said District Council to regulate the hours of labor
and the wages to be paid by plaintiff in the operation
of its said plant, and have made known to plaintiff
that in the event of the failure of plaintiff so to do,
the defendants, as such Carpenters' District Council,
and as business agents of said association would im-
mediately cause each and every member of said asso-
ciation to decline to accept service from any person
buying materials from the plaintiff, and to quit ser-
vice if engaged by any person buying materials from
the plaintiff, and that they would also cause and pro-
cure the other and similar associations with which they
were affiliated to take similar steps so as to cause all
the members of said associations to decline to be em-
ployed by any person, firm or corporation who might
purchase materials or supplies from plaintiff, and
would boycott plaintiff and all materials manufactured
and sold by plaintiff, and would cause and procure
said other associations so to do; and would cause and
procure contractors and dealers in the city of St. Louis
to refuse and decline to buy materials from plaintiff.

"And plaintiff says that these defendants, in
order to carry out the scheme of said association to
create a monopoly in behalf of the members, have
conspired and combined and confederated with each
other, with other members of said association whose
names are unknown, and with the officers, agents and
members of other associations in other lines of the
building industry organized for a similar purpose, to
harass plaintiff and to injure it in a business way and
to deprive it of the patronage of the contractors and
builders of the city of St. Louis, until such time as
plaintiff submits to their demands as hereinbefore
set forth.

"Plaintiff states that the scheme of said association and the endeavors of said District Council and of the defendants herein, as such District Council, and as business agents of said association, to create a monopoly in behalf· of the members of said association, and similar endeavors in their own behalf by the affiliated associations aforesaid, have been so far successful as that contractors and builders in the city of St. Louis are not able to obtain the requisite amount and supply of skilled labor of the class of the members of this and the affiliated associations entirely exclusive of members of said association and of members of affiliated associations; that plaintiff's customers, being said contractors and builders, are frequently and more often than otherwise under contract to complete or erect the particular building or do a given work within a given time, and that these defendants herein, as such District Council, and as the business agents of said association through their agents, have threatened to the plaintiff and to many of its customers (being such contractors and builders) that if they bought material from the plaintiff, and if they did not refuse further to deal with plaintiff in that regard, said Carpenters' District Council and said business agents would exercise their authority to cause such members of said association as were employed by said contractors and builders to quit such employment and to refuse to be employed by them, and not only that, but would also cause and induce said affiliated organizations, their officers and agents, to take similar steps with reference to their respective members, and thus cause such contractors and builders and customers of the plaintiff irretrievable injury and damage and hinder and prevent them from carrying on their business; and have issued circulars containing a declaration of boycott against the plaintiff and its manufactures, and containing threats to cause all members of said association to cease from employment, and to refuse employ-

ment with any person, firm or corporation buying or
using materials produced by plaintiff; and have cir-
culated and caused to be circulated such circulars
among contractors and builders and others connected
with the building trade in the city of St. Louis, and
have threatened to maintain representatives in the
vicinity of plaintiff's establishment and cause them to
follow plaintiff's wagons engaged in delivering ma-
terials to plaintiff's customers, and make the same
threats to such customers unless plaintiff acceded to
such demands; that in some cases defendants did cause
and call strikes and lockouts by the members of said
association and other affiliated associations, in cases
where some of said contractors and builders and cus-
tomers of plaintiff refused to accede to said demands;
that as a result of said threats and conduct, said con-
tractors and builders (customers of the plaintiff, as
aforesaid), have been led to fear strikes and lockouts
in connection with the contracts which they have under-
taken or might undertake, and they therefore have
refused, and still refuse, to deal with plaintiff, as
heretofore, and have in many instances been forced by
defendants to sign written contracts not to deal further
with plaintiff, all because and only because of such
threats and intimidation and conduct by the defendants
as such District Council, and as the business agents
of said association, and because of the power of said
District Council and of said defendants, as herein-
before set forth, to act in that behalf as threatened and
suggested; that by reason of such acts and conduct
on the part of said defendants in fostering said mon-
opoly and interfering with the rights of this plaintiff,
the trade of the plaintiff in the city of St. Louis has
been seriously impaired and is still further threatened
by reason of the fact that defendants now threaten
and now intend to continue to so interefere with con-
tractors and builders and persons dealing with plain-
tiff, until such time as a complete and perfect monopoly

of all the trade in their line in the city of St. Louis shall have been obtained for and in behalf of the members of said association.

"The defendants are insolvent, and plaintiff does not know the names of the members of said association, other than the defendants, and they number in the city of St. Louis many thousands of persons, and plaintiff can have no adequate remedy at law because of their inability to ascertain the persons composing said association, and because of the multiplicity of suits that would be entailed upon the plaintiff in an endeavor to right its wrongs by actions at law.

"Plaintiff says that under the scheme of said association, as above set forth, and under the powers conferred by said association upon said District Council and said business agents, and now being exercised and threatened as above set forth, each of said organizations is in restraint of trade, against public policy and in violation of the law, and that neither said association nor said Carpenters' District Council, as the governing body thereof, ought to be longer permitted to exist, and these defendants herein ought not longer be permitted to exercise the functions and powers which they are assuming to exercise as such District Council, and as business agents of said association, and officers thereof, in fostering and creating a monoply for the membership of said association.

"Plaintiff alleges that it has not been able to ascertain the identity of all the persons composing said Carpenters' District Council, but that these defendants are the active managers thereof and also, as stated above, the business and active agents of said association, and plaintiff believes and avers that these defendants sufficiently represent each of said organizations to bring each thereof before the court for such orders and decrees as may be meet and proper herein.

"Plaintiff states that the value of the relief sought and the damages which will accrue to plaintiff if the

defendants be not restrained as herein prayed exceeds $10,000.

"Wherefore plaintiff prays that a temporary injunction may be granted the plaintiff, restraining and enjoining said defendants and each of them and their successors in office, individually and as members of said Carpenters' District Council and as business agents of said association, their confederates, associates, agents and representatives, and the officers, agents and representatives of the United Brotherhood of Carpenters and Joiners and of the Carpenters' District Council thereof, and said associations, from boycotting or making effectual, promulgating or in any wise proclaiming any boycott upon or against the plaintiff, or its goods, and from sending, conveying or delivering in any way to any person, firm, corporation or association any boycott notice, verbal or otherwise, upon or against the plaintiff, or its goods, and from in any way menacing, hindering or obstructing the plaintiff by interfering with its patronage, business or customers, and from in any way impeding the plaintiff from the fullest enjoyment of all the patronage, business and custom which it may possess, enjoy or acquire, and from interfering with the plaintiff or its business by threats to any person who might be or become a customer of the plaintiff, that said defendants or any of them will cause or procure any person or persons whomsoever to cease business relations with any such customer of plaintiff, and from causing or procuring by any order, direction, request or command any person or persons whomsoever to decline to accept employment from, or to cease employment with any person, firm or corporation because of the fact that such person, firm or corporation has been or is about to be, or contemplates becoming a customer of the plaintiff; and that upon a final hearing hereof said injunction may be made perpetual, and said United Brotherhood of Carpenters and Joiners and said Car-

penters' District Council may be adjudged and decreed to be illegal organizations, and said defendants, their associates, confederates, agents and representatives, and the other officers and agents and representatives of said association be forever enjoined from further exercising any of the functions thereof, or acting as officers or agents thereof, and that said associations be dissolved by the judgment and decree of this court.

"And that plaintiff have leave, whenever it may be able to do so, to make other persons who have combined with the defendants herein in the behalf aforesaid, and persons associated with them as members of said District Council, parties hereto, and to have process issued and served upon them.

"And for such other and further relief as to the court may seem meet and proper."

The demurrer, omitting formal parts, reads as follows:

"Now come Reinhard Fuelle, George C. Newman, Walter G. Cole, Charles P. Gore, Emil R. Ruhle, James W. Trainer and James N. Shine, defendants in the above-entitled cause, and demur to plaintiff's second amended petition herein, and for grounds of said demurrer say:

"1. That said second amended petition fails to state facts sufficient to constitute a cause of action against these defendants or either of them.

"2. That upon the averments of said second amended petition, plaintiff is not entitled to the relief prayed for, nor to any equitable relief.

"3. Because under the averments in said second petition it appears that for any cause for complaint which plaintiff may have against these defendants or any of them, have a complete and adequate remedy at law.

"4. That, if any right to proceed in a court of equity against these defendants or any of them exists, section 8979 of the Revised Statutes of Missouri of

1899, expressly provides that the same shall be brought by the Attorney-General of the State or the circuit attorney of the city of St. Louis, when so directed by said Attorney-General.

"5. Because there is a defect of parties plaintiff."

I. The discussion of the legal propositions involved in this case took a wide range both in oral argument and in briefs.

Both show the great research made by learned counsel in the preparation and presentation of this case. So thorough and learned has it been, there remains but little or nothing to be said upon the principles underlying the case.

When reduced to its final analysis, this suit presents but two legal propositions for determination, namely:

FIRST. Do the United Brotherhood of Carpenters and Joiners of the city of St. Louis and their allied associations, whom defendants represent, constitute a monopoly or combination in restraint of trade?

SECOND. Is the conduct and action of defendants, prohibiting its members from working for builders, contractors and such other persons who purchase and use building materials manufactured by plaintiff, legal or illegal? and if illegal, will a court of equity enjoin such illegal conduct?

We will dispose of those two propositions in the order in which they are stated.

FIRST. According to the allegations of the petition and admissions of the demurrer, the United Brotherhood of Carpenters and Joiners of the city of St. Louis, and the various other associations with which it affiliates, are composed of carpenters, joiners and other persons who do carpenter work and other labor in the construction of houses and other buildings in the city of St. Louis and throughout the country. It

is alleged and admitted that the object and purpose of those associations is to shorten the hours of work and to increase the pay they are to receive for their labor.

While it might be conceded that labor organizations might be proper subjects for legislative control and regulation, yet the Legislature has not in its wisdom seen proper to do so; and at common law personal service—an occupation—could not be the subject of a monopoly. In discussing that question, in the case of State ex rel. v. Associated Press, 159 Mo. l. c. 456, this court used this language: "But there is nothing here on which a monopoly can attach. The business is one of mere *personal service;* an occupation. Unless there is 'property' to be 'affected with a public interest,' there is no basis laid for the fact or the charge of a monopoly."

The authorities seem to be uniform in holding that individuals have a perfect legal right to form labor organizations for the protection and promotion of the interest of the laboring classes, and deny the power to enjoin the members of such organizations from peaceably withdrawing from the service of the employer. [Railroad v. Hannahan, 121 Fed. 563; Natl. Protective Assn. v. Cumming, 170 N. Y. 315; Bowen v. Matheson, 14 Allen 499; Gray v. Building Trades Council, 91 Minn. 171; Thomas v. Railroad, 62 Fed. 803; Ames v. Railroad, 62 Fed. 7; Railroad v. Gee, 140 Fed. 153; Arthur v. Oakes, 11 C. C. A. 209.]

Many more adjudications of the same nature exist and might be cited, but as there is no conflict between the modern decisions upon this question, it would be a useless waste of time and labor to cite more. These decisions are based upon the law which permits every one to enter into any kind of a contract which has for its object and purpose the protection and promotion of the interest of the parties thereto, as well as the betterment of their condition in life; and that

right to so contract is not curtailed or abridged if, per chance, the contract indirectly or incidently operates in restraint of trade.

We must, therefore, hold that the United Brotherhood of Carpenters and Joiners and their allied associations, whom the defendants represent, are not unlawful combinations made and entered into in restraint of trade, but are legal and highly laudible when confined within proper bounds.

II. The second proposition presented for consideration seems to be equally well settled by the authorities; and nothing we might say upon the question could throw any light upon it or strengthen the principle of law upon which it is founded. We will, therefore, content ourselves by simply restating the rule as we find it in the numerous adjudications of this country, and quote from a few leading cases showing its application.

In brief, the petition charges defendants and those with whom they are affiliated with having entered into a conspiracy or an unlawful combination to injure and damage plaintiff's business by having coerced and intimidated certain contractors and builders from purchasing and using all building materials manufactured by it in any building to be constructed by them by prohibiting their members from working upon all buildings in which plaintiff's said materials were being used.

The demurrer admits the allegations of the petition to be true, except the allegation that the conduct of defendants is unlawful. In other words, counsel for plaintiff contends that the petition, in short, charges defendants with boycotting plaintiff's business, and that the demurrer admits the charge to be true; while counsel for defendants contends that the petition only charges them with having entered into an agreement to

protect their own interest and that the conduct complained of is not for that reason unlawful.

The word "boycott" has been defined by many courts, in different language, but all agree substantially as to the meaning of the word. After an extensive review of the authorities, the Supreme Court of Minnesota, in the recent case of Gray v. Building Trades Council, 91 Minn. l. c. 179, defines the word in the following language: "A boycott may be defined to be a combination of several persons to cause a loss to a third person by causing others against their will to withdraw from him their beneficial business intercourse through threats that, unless a compliance with their demands be made, the persons forming the combination will cause loss or injury to him; or an organization formed to exclude a person from business relations with others by persuasion, intimidation, and other acts, which tend to violence, and thereby cause him through fear of resulting injury to submit to dictation in the management of his affairs. Such acts constitute a conspirary, and may be restrained by injunction."

If that is the proper definition of the word boycott, then the petition clearly charges the defendant with being guilty of boycotting plaintiff's business, for the reason, as before stated, the petition charges the defendants with having formed a combination to injure plaintiff's business, by having caused the builders of the city of St. Louis, against their will, to withdraw from plaintiff their beneficial business intercourse through threats that unless a compliance with their demands be made, the defendants will cause a strike to be called against the said business.

All the authorities hold that a combination to injure or destroy the trade, business or occupation of another by threatening or producing injury to the trade, business or occupation of those who have business relations with him is an unlawful conspiracy

regardless of the name by which it is known, and may be restrained by injunction.

In discussing this question the Supreme Court of Minnesota, in the case before cited, on pages 180 to 183, used this language:

"In Hopkins v. Oxley Stave Co., 83 Fed. 912, 28 C. C. A. 99, 104, Judge Thayer, speaking for the Court of Appeals of the Eighth Circuit, said: 'While the courts have invariably upheld the right of individuals to form labor organizations for the protection of the interests of the laboring classes, and have denied the power to enjoin the members of such associations from withdrawing . . . either singly or in a body, even where such withdrawal involves a breach of contract, . . . yet they have very generally condemned those combinations usually termed "boycotts," which are formed for the purpose of interfering, otherwise than by lawful competition, with the business affairs of others, and depriving them, by means of threats and intimidation, of the right to conduct the business in which they happen to be engaged, according to the dictates of their own judgments.'

"In the case of Moores v. Bricklayers' Union, 23 Wkly. Law Bul. 48, it appears that a labor union became involved in some controversy with one Parker concerning various matters, and, in order to bring Parker to their terms, the union notified materialmen that anyone selling to him would be boycotted. Moores, plaintiff in the action, persisted in selling to Parker notwithstanding this notice, and the union promptly notified all of Parker's customers or prospective customers that none of its members would work Moores' material, thereby causing serious damage to the business of Moores. There were no acts or threats of violence shown, but the court held that the acts of the members of the union amounted to an unlawful conspiracy, and a recovery against them was upheld.

"While the question of boycott was not involved in the case of Ertz v. Produce Exchange, 79 Minn. 140, 81 N. W. 737, the principles of the law applicable thereto were involved and discussed by the court. It was there held, upon facts showing that a dealer in farm produce had established a profitable business, and that defendants had conspired to induce others not to deal with him, it not appearing that their interference with his business was to further any legitimate interests of their own, but done maliciously to injure him, that it was a conspiracy and actionable. The court there said: 'But one man singly, or any number of men jointly, having no legitimate interests to protect, may not lawfully ruin the business of another by maliciously inducing his patrons and third parties not to deal with him.' The decision in that case is in line with the authorities generally, and places this court with the weight of authority in holding that boycotts are illegal. . . .

"What amounts to coercion, intimidation, or threats of injury, must necessarily depend upon the facts of each particular case. [Plant v. Woods, 176 Mass. 492, 57 N. E. 1011; Sherry v. Perkins, 147 Mass. 212, 17 N. E. 307.] In Barr v. Essex Trades Council, 53 N. J. Eq. 101, 122, 30 Atl. 881, it was said that: 'The clear weight of authority undoubtedly is that a man may be intimidated into doing or refraining from doing [a particular act] by fear of loss of life or injury to health or limb; and the extent of this fear need not be abject, but only such as to overcome his judgment, or induce him not to do, or to do, that which otherwise he would have done or have left undone.' Intimidation, within the meaning of the law, is not necessarily limited to threats of violence to person or property. A combination between persons merely to regulate their own conduct and affairs is allowable, and a lawful combination, though others may be indirectly affected thereby; but a combination

to do injurious acts, expressly directed to another by way of intimidation or constraint, either of himself or of persons employed, or seeking to be employed, by him, is outside of allowable competition and unlawful. [Vegelahn v. Guntner, 167 Mass. 97, 44 N. E. 1077.] The interference is held by many of the authorities unlawful although it does not affect existing contract relations. The wrongful interference with one's business and prospective customers is as much an infringement of his rights as though contractual relations actually existed and were interfered with. [Jersey City Prtg. Co. v. Cassidy (N. J. Eq.), 53 Atl. 230; Addison, Torts, 7.]

"In restraining boycotts, the authorities proceed on the theory that they are unlawful interferences with property rights. The Constitution of our State guarantees liberty to every citizen, and a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property, or character; and the rights so guaranteed are fundamental, and can be taken away only by the law of the land, or interfered with, or the enjoyment thereof modified, only by lawful regulations adopted as necessary for the general public welfare. As remarked by Judge BRADLEY in the 'Slaughter-House Cases,' 16 Wall. 36, 116, 'For the preservation, exercise and enjoyment of those rights, the individual citizen, as a necessity, must be left free to adopt such calling, profession, or trade as may seem to him most conducive to that end. . . . This right to choose one's calling is an essential part of that liberty which it is the object of government to protect; and a calling, when chosen, is a man's property and right. Liberty and property are not protected where these rights are arbitrarily assailed.' A person's occupation or calling, by means of which he earns a livelihood and endeavors to better his condition, and to provide for and support himself and

those dependent upon him, is property within the meaning of the law, and entitled to protection as such; and as conducted by the merchant, by the capitalist, by the contractor or laborer, is, aside from the goods, chattels, money, or effects employed and used in connection therewith, property in every sense of the word. Labor may organize, as capital does, for its own protection and to further the interests of the laboring class. They may strike, and persuade and induce others to join them, but when they resort to unlawful means to cause injury to others with whom they have no relation, contractual or otherwise, the limit permitted by the law is passed, and they may be restrained.''

The same question came before the Supreme Court of Michigan, in the case of Beck v. Teamsters' Protective Union, 118 Mich. 497, and on pages 516 to 520 this language was used:

''It is conceded that courts of equity have jurisdiction to restrain conspiracies of this character when irreparable injury is sure to follow. Suits at law would be inadequate, and a multiplicity of suits at law would arise. Complainants were engaged in a lawful business, and carrying it on in a lawful manner. They had done nothing to the defendants, or any of them, either illegal, immoral or unjust. They were paying wages to their teamsters in fact greater than the union teamsters received, because they made no deductions for certain lost time which the union employers made. The law protects them in the right to employ whom they please, at prices they and their employees can agree upon, and to discharge them at the expiration of their term of service or for violation of their contracts. This right must be maintained, or personal liberty is a sham. So, also, the laborers have the right to fix a price upon their labor, and to refuse to work unless that price is obtained. Singly, or in combination, they have this right. They may organize in order to improve their condition and secure

better wages.  They may use persuasion to induce men to join their organization, or to refuse to work except for an established wage.  They may present their cause to the public in newspapers or circulars, in a peaceable way, and with no attempt at coercion.  If the effect in such case is ruin to the employer, it is *damnum absque injuria*, for they have only exercised their legal rights.  The law does not permit either party to use force, violence, threats of force or violence, intimidation, or coercion.  The right to trade and the personal liberty of the employer alone are not involved in this case; the right of the laborer to sell his labor when, to whom, and for what price he chooses is involved.

"The five teamsters of the complainants were satisfied with their wages and their treatment.  By the action of the defendants, they were thrown out of employment during the summer, except as complainants employed them, when they could, at other work about their mill.  The union would not permit Mr. Pfaff to use a horse and wagon which complainants tendered him free of expense, in order that he might provide for himself and family.  A boycott of labor as well as of capital is therefore involved in this controversy.  The acts and conduct of these defendants are not those of freedom, but of tyranny.

"Let us look at the correlative of what these defendants did.  If employees have the right to combine to fix their wage rate—and this is conceded—employers have the like right to combine to fix a rate they are willing to pay.  The law is the same for both, and is alike open to both.  If the employers of Detroit had combined in secret organization, established a rate, and agreed to boycott, in the manner these defendants boycotted complainants, any employer and his laborers who would pay more than the price the combination had agreed to, and had carried the conspiracy out, as was done here, would

these defendants consider that just and lawful con-
duct? Neither courts of equity nor of law would
turn such employer and employees away from its
temple of justice without a remedy.

"It requires no argument to show that in this
case, both in reason and authority, actions at law
would be utterly inadequate. The course pursued by
these defendants, if unchecked, would soon ruin the
complainants' business, and bring upon them financial
ruin. The defendants and their associates well knew
this, and undoubtedly hoped to force complainants to
abdicate their legal rights, and to permit defendants
to dictate whom complainants should employ, the price
they should pay, and the reasons for discharging their
employees. While some writers have doubted the
remedy by injunction, it is now settled beyond dis-
pute. [Thomas v. Railroad, 62 Fed. 803; Springhead
Spinning Co. v. Riley, L. R. 6 Eq. Cas. 551; Vegelahn
v. Guntner, 167 Mass. 92 (35 L. R. A. 722, 57 Am. St.
Rep. 443); Davis v. Zimmermann, 91 Hun 489; Gilbert
v. Mickle, 4 Sandf. Ch. 357; U. S. v. Elliott, 64 Fed.
27; Hopkins v. Oxley Stave Co., 28 C. C. A. 99, 83 Fed.
912; Railroad v. Pennsylvania Co., 54 Fed. 730 (19
L. R. A. 387); Sherry v. Perkins, 147 Mass. 212 (9 Am.
St. Rep. 689); Hamilton-Brown Shoe Co. v. Saxey, 131
Mo. 212 (52 Am. St. Rep. 622); Arthur v. Oakes, 11
C. C. A. 209, 63 Fed. 310 (25 L. R. A. 414).] Many
more authorities might be cited.

"There is a long list of civil and criminal author-
ities which might also be cited holding such combina-
tions unlawful. Among them are the following: State
v. Donaldson, 32 N. J. Law 151 (90 Am. Dec. 649);
State v. Glidden, 55 Conn. 46 (3 Am. St. Rep. 23);
Reg. v. Bunn, 12 Cox, Cr. Cas. 316; Rex v. Ferguson,
2 Starkie 489; People v. Fisher, 14 Wend. 9 (38 Am.
Dec. 501); People v. Kostka, 4 N. Y. Cr. 429; Walker
v. Cronin, 107 Mass. 555; Carew v. Rutherford, 106
Mass. 1 (8 Am. Rep. 287); People v. Melvin, 2 Wheeler,

Cr. Cas. 262; Crump v. Com., 84 Va. 927 (10 Am. St. Rep. 895); State v. Stewart, 59 Vt. 273 (59 Am. Rep. 710); Callan v. Wilson, 127 U. S. 540. For instances of lawful combinations, see Com. v. Hunt, 4 Metc. (Mass.) 111 (38 Am. Dec. 346); Master Stevedores' Association v. Walsh, 2 Daly 1; Wood v. Bowron, 10 Cox, Cr. Cas. 344; Mogul Steamship Co. v. McGregor, L. R. 23 Q. B. Div. 598; Allen v. Flood, L. R. App. Cas. (1898) 1; Brewster v. Miller (Ky.), 41 S. W. 301; Macauley v. Tierney, 19 R. I. 255 (37 L. R. A. 455, 61 Am. St. Rep. 770); Clemmitt v. Watson, 14 Ind. App. 38.

"The law abhors subterfuges. It lays aside the covering and looks to the actual facts beneath. In the language of Chief Justice SHAW: 'The law is not to be hoodwinked by colorable pretenses; it looks at truth and reality through whatever disguise it may assume.' [Com. v. Hunt, 4 Metc. (Mass.) 111, 129 (38 Am. Dec. 346).]

"Threats in language are not the only threats recognized by the law. Covert and unspoken threats may be just as effective as spoken threats. So, where banners were displayed in front of one's premises bearing the following inscription: 'Lasters are requested to keep away from P. P. Sherry's. Per order L. P. U.'—it was held unlawful, and the act restrained by injunction. [Sherry v. Perkins, 147 Mass. 212 (9 Am. St. Rep. 689).] The court said: 'The banner was a standing menace to all who were, or wished to be, in the employment of the plaintiffs, to deter them from entering the plaintiff's premises.' The court held that the display of the banners was part of the scheme unlawfully entered into.

"So, when these defendants went, in numbers of from 5 to 25, along the streets, and into the business houses of complainants' customers, distributing these circulars, which contained false statements, as hereinafter shown, and which commenced and closed with

the words, 'Boycott Jacob Beck & Sons,' they intended, in emphatic manner, to convey to the customers of complainants that they would be treated in like manner unless they ceased to trade with complainants. The distance that this was done from the mill of the complainants does not detract from its character or harmfulness. It was just as effective and as wrong when done 1,000 feet from the mill as when done 10 feet from it. The act itself, not the distance, determines its character."

Upon the same subject the Supreme Court of Maryland, in the case of My Maryland Lodge v. Adt, 100 Md. 249 to 252, said:

"The plaintiff was engaged in a lawful business, and was carrying it on in a lawful way. There is no pretense that he had done anything to any of the defendants which was either illegal, immoral or unjust. He was paying wages to his employees at a higher rate than wages paid by other establishments, and was willing to still further increase them so as to reach the ten per cent addition which the defendants demanded he should pay. The law protects him in his right to employ whom he pleases, at prices which he and his employees can agree upon, and he has the further right to discharge them at the expiration of their term of service, or for violation of their contract. This right must be conceded, or personal liberty is a delusion. On the other hand, the employees have a perfect legal right to fix a price upon their labor, and to refuse to work unless that price is obtained. They have the right both as individuals and in combination. They may organize to improve their condition and to secure better wages. They may even use persuasion to have others join their organization. They have an unquestionable right to present their cause to the public in newspapers or circulars in a peaceable way, but with no attempt at coercion. If ruin to the employer results from their peaceable as-

sertion of these rights, it is a damage without remedy.
But the law does not permit either employer or em-
ployee to use force, violence, threats of force or threats
of violence, intimidation or coercion.   As is very aptly
stated by the Supreme Court of Connecticut in State
v. Glidden, 55 Conn. 49, 'It seems strange that in this
day, and in this free country—a country in which law
interferes so little with the liberty of the individual—
it should be necessary to announce from the Bench that
every man may carry on his business as he pleases,
may do what he will with his own, so long as he does
nothing unlawful and acts with due regard to the rights
of others; and that the occasion for such an announce-
ment should be, not an attempt by government to inter-
fere with the rights of the citizen, nor by the rich and
powerful to oppress the poor, but an attempt by a large
body of workingmen to control by means little, if any
better than force, the action of employers.'   Glidden's
case was a criminal prosecution.   The indictment
charged that if the Carrington Publishing Company
did not yield to the demands of the defendants with
respect to discharging certain of its workmen and with
respect to employing others, they, the defendants, and
their associates would threaten all persons dealing with
the corporation, and that they could and would so
control, boycott and injure the business customers, and
by stopping and preventing the patronage of others
through threats and intimidations and by other unlaw-
ful means compel such customers, though against their
will, to cease doing business with the subscribers and
other patrons of the publishing company; and that the
defendants would not give up or abandon those pro-
ceedings to injure the business of the company until
they had either destroyed said business and prevented
it from being carried on, or until the company should
comply with their demands.   In addition to the lan-
guage we have just above quoted from the judgment
of the court, the opinion states: 'If we look at this

transaction as it appears on the face of this informa-
tion we shall be satisfied that the defendants' purpose
was to deprive the Carrington Publishing Company of
its liberty to carry on its business in its own way,
although in doing so it interfered with no right of
the defendants.    The motive was a selfish one—to
gain an advantage unjustly, and at the expense of
others, and therefore the act was legally corrupt.    As
a means of accomplishing the purpose the parties in-
tended to harm the Carrington Publishing Company,
and therefore it was malicious.'    A case strikingly like
the one at bar is Beck v. Ry. Teamsters Union, 118
Mich. 497, 42 L. R. A. 407.    In the case which has last
been alluded to, an injunction was issued to restrain
a boycott, and the boycott circular was somewhat more
elaborate but not more pointed than the one which
we have quoted in full in an early part of this opin-
ion.

"It is too late to doubt the jurisdiction of a court
of equity to grant relief in such cases as this, if the
averments of the bill are sustained by the evidence.
The adjudged cases seem to be all one way.    [Thomas
v. Railroad, 62 Fed. 803; Vegelahn v. Guntner, 167
Mass. 92, 35 L. R. A. 722; Railroad v. Penn. Co., 54
Fed. 730, 19 L. R. A. 387; Arthur v. Oakes, 11 C. C. A.
209, 25 L. R. A. 414; Barr v. Essex Trades Council,
35 N. J. Eq. 101, 30 Atl. 881; Sherry v. Perkins, 147
Mass. 212; Boutwell v. Marr, 71 Vt. 1, 43 L. R. A. 803;
Casey v. Cin. Typ. Union, 45 Fed. 135, 12 L. R. A.
193; Note IV Passaic P. Works v. Ely, etc., Co., 62
L. R. A. 694.]    This list of cases might be swelled a
hundred fold; but we do not deem it necessary to cite
any others.    Those that we have referred to are quite
analogous to the one now before us.

"In Casey v. Cincinnati Typographical Union, 12
L. R. A. 193, there was an attempt to compel the plain-
tiff, the proprietor and publisher of a daily and weekly
newspaper, to unionize his establishment.    No violence

or threats of violence were used, and the court says it was an organized conspiracy to force the plaintiff to yield his right to select his own workmen, and submit himself to the control of the union, and to allow it to regulate prices for him and to determine whom he should employ and whom he should discharge. In other words, it was an organized effort to force printers to come into the union or be driven from their calling for want of employment, and to make the destruction of the plaintiff's business the penalty for his refusing to surrender to the union. Whatever moral obligation may have been incurred by the plaintiff by reason of his promises to unionize his office, they were wholly without consideration. 'No case has been cited where upon a proper showing of facts an unsuccessful appeal has been made to a court of chancery to restrain a boycott. The authorities are all the other way. At common law an agreement to control the will of employers by improper molestation was an illegal conspiracy.' "

This question also came before the Supreme Court of New Jersey in the case of Barr v. Essex Trades Council, 53 N. J. Eq. 101, which is one of the best and most carefully considered cases to be found upon the subject, and on pages 111 to 119, this language is used:

"No unprejudiced person at this day wishes to place any obstacle in the way of labor organizations conducting their operations within lawful limits. It is unfortunate that, despite the warning and counsel of accredited leaders, the reckless and revengeful among the members, with the vicious and lawless always to be found among the idle, so often take advantage of labor demonstrations to commit acts of violence against persons and property, and thus weaken the sympathy of the public with the system. Yet, everyone must acknowledge that organization has accomplished much in the past for the benefit of the work-

ingman, and recognize its possibilities to secure to him, in the future, the enjoyment of other privileges. But while engaged in this laudable purpose, those who give direction to affairs should not attempt to secure their ends by infringing the lawful rights of others. When they are accused of so doing, it is the province of the courts, when the question is properly presented, to define and protect the rights of those brought within their jurisdiction. In discharging this duty, judges can only decide on established principles and rules, and are not empowered to create rights or initiate new powers or privileges. That is a legislative, not a judicial, function. It would seem to be unnecessary to state such elementary truths were it not that other views appear to be entertained by some. . . . .

"Are the defendants, then, privileged knowingly to inflict this injury on the complainant? [8 Harv. Law Rev., 1.]

"A man's business is property. By the first section of the Bill of Rights of the Constitution of New Jersey, the right of acquiring, possessing and protecting property is classed, as a natural and inalienable right which all men have, with those of enjoying and defending life and liberty, and of pursuing and obtaining safety and happiness. This is an echo of Magna Charta repeated in the Declaration of Independence. Mr. Justice Bradley, in the Slaughter-House Cases, 16 Wall. 36 (at p. 116) says: 'For the preservation, exercise and enjoyment of these rights [life, liberty and the pursuit of happiness] the individual citizen, as a necessity, must be left free to adopt such calling, profession or trade as may seem to him most conducive to that end. Without this right he cannot be a freeman. This right to choose one's calling is an essential part of that liberty which it is the object of the government to protect; and a calling, when chosen, is a man's property and right. Liberty and property are not protected where these rights are arbitrarily assailed.'

"Mr. Barr's business of publishing the paper with the incidents of its circulation and advertising was as much his property as were the type and presses upon which the paper was printed. A harmful interference with the circulation and with the advertising in his paper was, therefore, an injury to his property. It was Mr. Barr's personal right, without interference or dictation from any person or persons, to employ, in the prosecution of his business, such mechanical appliances as were safe and healthful, and to employ, in the protection of his paper, such persons and lawful means as he might choose.

"It is said in Hilton v. Eckersley, 6 El. & B. 47: 'It is the privilege of a trader in a free country, in all matters not contrary to law, to regulate his own mode of carrying it [his business] on according to his own discretion and choice.'

"Mr. Justice BEATTY, in Coeur D' Alene Con. & Min. Co. v. Miners' Union, 51 Fed. 260, says: 'Whatever enthusiasts may hope for, in this country every owner of property may work it as he will, by whom he pleases, at such wages and upon such terms as he can make; and every laborer may work or not, as he sees fit, for whom, and at such wages as he pleases; and neither can dictate to the other how he shall use his own, whether of property, time or skill.'

"Sir William Erle, in his book entitled 'The Law Relating to Trades Unions,' which Lord Esher has said is a book more full of careful and accurate law than is to be found in many judgments (at p. 13), says: 'These propositions assume that a person has a right to do so as he chooses with his own, whether labor or capital, within the limits set by law; that a right involves a prohibition against the infringement thereof, and that a prohibition involves a remedy for the violation thereof.'

"At p. 12: 'Every person has a right under the law, as between him and his fellow-subjects, to full

freedom in disposing of his own labor or his own capital, according to his own will. It follows that every other person is subject to the correlative duty arising therefrom, and is prohibited from any obstruction of the fullest exercise of this right which can be made compatible with the exercise of similar rights by others. Every act causing an obstruction to another, in the exercise of the right, comprised within this description—done, not in the exercise of the actor's own right, but for the purpose of obstruction—would, if damage should be caused thereby to the party obstructed, be a violation of this prohibition; and the violation of this prohibition by a single person is a wrong, to be remedied either by action or indictment, as the case may be. It is equally wrong whether it be done by one or by many—subject to this observation, that a combination of many to do a wrong, in a matter where the public has an interest, is a substantive offense of conspiracy.'

"This freedom of business action lies at the foundation of all commercial and industrial enterprises—men are willing to embark capital, time and experience therein, because they can confidently assume that they will be able to control their affairs according to their own ideas, when the same are not in conflict with law. If this privilege is denied them, if the courts cannot protect them from interference by those who are not interested with them, if the management of business is to be taken from the owner and assumed by, it may be, irresponsible strangers, then we will have come to the time when capital will seek other than industrial channels for investments, when enterprises and development will be crippled, when interstate railroads, canals and means of transportation will become dependent on the paternalism of the national government, and the factory and the workshop subject to the uncertain changes of co-operative systems.

"The acts of the defendants directly infringe upon the exercise of this right by Mr. Barr. True, explicitly in words, they recognize the right and protest earnestly that they have no wish to interfere with him in the management of his business, with such means as he may select, but is it not perfectly apparent that the only purpose of the movement is to force him to abandon his determination to use plate matter in the make-up of his newspaper?

"Certain members of Typographical Union No. 103, who were employees in his newspaper office, abandoned his employment. This they had a perfect right to do under the law. No man can be required to work for another unless he so desires, and it is his right, outside of contractual duties, to cease an employment which is distasteful to him, and, within the limit authorized by the statute of 1883, it is lawful for a number to combine to leave the service of their employer. If the defendants had stopped here, they would have been clearly within the exercise of their legal rights. But the members of the Typographical Union No. 103 were not content to stand on this right; they, through the Essex Trades Council, are affiliated with other unions and aggregate a body in a single county of this State which boasts (and I have no doubt truly) of a purchasing power of $400,000 a week. The bare declaration by the Typographical Union that it no longer recognized the 'Newark Times,' was, according to Mr. Beckmeyer's affidavit, sufficient, under this perfect organization, to render it incumbent upon every member of these different unions to withhold his patronage from it. Not only this, but by the passage of the resolutions mentioned by the different unions, and the distribution thereof among advertisers, a moral intimidation was brought to bear upon the latter to further cripple the paper, either by wholly withdrawing their advertisements or by leaving spaces, a most effective

method of. calling attention to the fact that the paper was under the ban of organized labor.

"Why this action? It must have had a purpose. None of the different labor organizations or the members thereof, except the Typographical Union No. 103, had or has any grievance against the complainant. Their action, in the language of the times, was purely sympathetic. As to the typographical union, its members had no complaint against Mr. Barr, except that he used certain appliances which were not acceptable to the union. He paid the wages fixed by, and employed only members of, the union. The withdrawal of certain of the members from his employment was solely because he chose to use plate matter interdicted by the union, and it is plain, if the complainant would forego his own judgment in the management of his business in this regard, and comply with the wishes and determination of the typographical union with reference thereto, all matters being as they were, the whole difficulty would be at an end. To effect this purpose, therefore, the typographical union, through the trades council, enlisted the co-operation of the other organizations in an attempt to so impair the success of the newspaper that the complainant would be forced to accept the alternative proposed rather than sustain the loss.

"We return to the question whether defendants' acts are actionable.

"Malicious injury to the business of another has long been held to give a right of action to the injured party. [Garret v. Taylor, Cro. Jac. 567; Keeble v. Hickeringill, 11 East 574; Gunter v. Astor, 4 J. B. Moore 12; Lumley v. Gye, 2 El. & Bl. 216; Gregory v. Brunswick, 6 Man. & G. 205; Young v. Hichens, 6 Ad. & E. (N. S.) 606; Temperton v. Russell, L. R. 1 Q. B. (1893) 715; Carew v. Rutherford, 106 Mass. 1; Walker v. Cronin, 107 Mass. 555; Van Horn v. Van Horn, 23 Vr. 284; Lucke v. Clothing Cutters'

and Trimmers' Assembly, 19 L. R. A. 408; Curran v. Galen, 22 N. Y. Supp. 826; Bradley v. Pierson, 148 Pa. St. 502; Ryan v. Brewing Co., 13 N. Y. Supp. 660; Moores v. Bricklayers' Union, 23 Week. L. Bul. 48, 7 Corp. L. J. 108; Delz v. Winfree, 80 Tex. 400; Olive v. Van Patten, 25 S. W. 428; Jackson v. Stanfield, 137 Ind. 592; Railroad v. Greenwood, 2 Tex. Civ. App. 76; Chipley v. Atkinson, 23 Fla. 206; Haskins v. Royster, 70 N. C. 601; Bixby v. Dunlap, 56 N. H. 456; Mapstrick v. Ramge, 9 Neb. 390.]

"In Carew v. Rutherford, 106 Mass. 1, Chief Justice CHAPMAN (at p. 15), says: 'Freedom is the policy of this country. But freedom does not imply a right in one person, either alone or in combination with others, to disturb or annoy another, either directly or indirectly, in his lawful business or occupation, or to threaten him with annoyance or injury, for the sake of compelling him to buy his peace.'

"Mr. Justice VAN SYCKEL, in Van Horn v. Van Horn, 27 Vr. 318, after reviewing the cases involving the recovery of damages in an action on the case as for a conspiracy (at p. 523), says: 'The rule to be deduced from these cases, and one which has the most ample support, is that, while a trader may lawfully engage in the sharpest competition with those in a like business by holding out extraordinary inducements, by representing his own wares to be better and cheaper than those of others, yet, when he oversteps that line and commits an act with the malicious intent of inflicting injury upon his rival's business, his conduct is illegal, and if damage results from it the injured party is entitled to redress. Nor does it matter whether the wrongdoer effects his object by persuasion or by false representation. The courts look through the instrumentality or means used to the wrong perpetrated with the malicious intent, and base the right of action upon that.' The right of action depends, then, not so much upon

the nature of the act as upon the intent with which
it is done, always assuming that injury has attended
the doing of it. Mr. Justice TAFT, in Railroad v. Penn.
Co., 54 Fed. 730, with reference to a condition similar
to that presented here (at p. 738), says: 'Ordinarily,
when such a combination of persons does not use vio-
lence, actual or threatened, to accomplish their pur-
pose, it is difficult to point out with clearness the illegal
means or ends which make the combination an un-
lawful conspiracy, for it is generally lawful for the
combiners to withdraw their intercourse and its bene-
fits from any person and to announce their intention
of doing so, and it is equally lawful for the others,
of their own motion, to do that which the combiners
seek to compel them to do. Such combinations are said
to be unlawful conspiracies, though the acts in them-
selves and considered singly are innocent, when the
acts are done with malice, i. e., with the intention to
injure another without lawful excuse.' Citing many
authorities.

"In Bowen v. Hall, L. R. 6 Q. B. Div. 333, it is
said: 'If the persuasion be used for the indirect pur-
pose of injuring the plaintiff, or of benefiting the de-
fendant at the expense of the plaintiff, it is a malicious
act, which is in law and in fact a wrong act, and there-
fore a wrongful act, and therefore an actionable act
if injury ensues from it.'

"Lord-Justice BOWEN, in Mogul Steamship Co.
v. McGregor, L. R. 23 Q. B. Div. 608: 'Now, inten-
tionally to do that which is calculated in the ordinary
course of events to damage, and which does in fact
damage another in that other person's property or
trade, is actionable if done without just cause or ex-
cuse. Such intentional action, when done without just
cause or excuse, is what the law calls a malicious
wrong.' See also, Temperton v. Russell, supra.

"This renders necessary an inquiry as to the in-
tent of the defendants to ascertain if the case falls

within the class in which it is held that a malicious
motive in the defendant may make an act which would
not be wrongful without the malice, a wrongful act
when done with malice. [Mogul Steamship Co. v. Mc-
Gregor, L. R. 23 Q. B. Div. 598, 608.] From the author-
ities, the test is, has the injury been inflicted inten-
tionally and without legal excuse?

"When we speak in this connection of an act
done with a malicious motive, it does not necessarily
imply that the defendants were actuated in their pro-
ceedings by spite or malice against the complainant
Mr. Barr, in the sense that their motive was to injure
him personally, but that they desired to injure him
in his business in order to force him not to do what
he had a perfect right to do. [Temperton v. Russell,
supra.] In this case the defendants have, I doubt not,
no personal spite against Mr. Barr individually, and no
desire to do him a personal injury. Nor do I suppose
they wish to permanently injure his enterprise, for
they undoubtedly want re-employment for those who
left him. They only wish, by crippling his business,
to compel him to accede to their views as to materials
he shall use in the make-up of his paper. They in
fact claim that they had no intention to injure the
business of the complainant, and that their only de-
sire was for the protection of themselves. If the in-
jury which has been sustained or which is threatened
is not only the natural but the inevitable consequence
of the defendants' acts, it is without effect for them
to disclaim the intention to injure. It is folly for a
man who deliberately thrusts a fire brand into a rick
of hay to declare, after it has been destroyed, that he
did not intend to burn it. If a person deliberately dis-
charges a loaded pistol, at point-blank range, directly
at the person of another, it is useless for him to say
that he did not intend to maim his victim. The law, as
a rule, presumes that a person intends the natural re-

sult of his act; and this is true with reference to civil as well as criminal acts. 'Courts are bound to look at things just as they are, to pass on facts just as they are developed, to treat the conduct of men just as it is, and to impute to them that intention which their acts and their conduct disclose was their intention.' [United States v. Kane, 23 Fed. 750.]

"What other result than injury could ensue to the business of the 'Newark Times,' published and circulated in Newark and its vicinity, if organizations of individuals representing there a purchasing power of $400,000 a week, each and every one not only determined not to patronize the paper or to buy it, but by resolutions passed in their various organizations call upon the trading community to cease advertising in it, with implied threats that the appearance of an advertisement by a tradesman in the paper would be a warning to the members of the organizations to avoid trading with such persons? Loss of business is the only natural result to be expected from such a condition of affairs, and if continued the failure of the enterprise would seem to be inevitable. That this is not an unfounded fear, we have it proved and admitted by the resolutions of the unions that the property of the complainant has already been injured by the acts of the defendants."

The Supreme Court of California, in the case of Goldberg, Etc., Co. v. Stablemen's Union, 149 Cal., said, on pages 432 to 434:

"We think that the complaint clearly states facts sufficient to constitute the cause of action alleged. It is not necessary here to undertake to define the limits within which a number of persons conspiring for the purpose of injuring the business of another may legally do acts tending to accomplish that result. It is averred in the complaint that in the case at bar, and for the purpose above stated, and with intent to

threaten and intimidate employees and patrons and customers of plaintiff, the said defendants do keep immediately in front of plaintiff's place of business, and threaten to so keep there, representatives and pickets bearing the placards and transparencies above set forth, and that by said means they have intimidated patrons and customers of plaintiff from entering said place of business, and will, if not restrained, continue to so intimidate the said patrons. It cannot be successfully contended that the said acts of defendants committed immediately in front of plaintiff's place of business as aforesaid could not, in the nature of things, have had the effect of intimidating plaintiff's patrons, and as it is averred that they did have that effect, the fact of such intimidation must, for the purposes of this case, be considered as established. And such acts, having such effect, undoubtedly interfered with and violated plaintiff's constitutional right to acquire, possess, defend, and enjoy property. In many cases cited in respondent's brief a 'boycott' was enjoined without reference to the means used to carry it into effect; as, for instance, in Oxley Stave Co. v. Coopers', etc., Union, 72 Fed. 695, it was held that 'A boycott by the members of trades unions or assemblies (which term in law implies a combination to inaugurate and maintain a general proscription of articles manufactured by the party against whom it is directed) is unlawful and may be enjoined by a court of equity.' But there is no necessity to go that far in the case at bar; here the alleged acts tended directly to intimidate customers, and did intimidate them. That in such a case the threatened acts will be enjoined has been frequently held. In Allis Chalmers Co. v. Reliable Lodge, 111 Fed. 264, the court said: 'That a conspiracy existed among a number of these officers and members to stop and thereby injure the business of complainant by intimidation and violence is evident. . . . These being the facts in the case, the law is clear and em-

phatic. The jurisdiction being established, is there any doubt as to whether the court should, in this case, grant the temporary injunction prayed for? I am clear there is not. As now presented, the court must grant the writ, in broad and unmistakable terms, commensurate with the exigencies of the situation, as shown by the facts and evidence upon this proceeding. To do so will work no hardship, nor will it even hamper the actions of any law-abiding person. Indeed, no one without purpose to commit an unlawful act could be affected thereby.' In United States ex rel. v. Haggerty, 116 Fed. 510, the court said: 'This court, however, has heretofore, upon repeated occasions, recognized the power of the court to issue injunctions in cases where there is a combination and conspiracy upon the part of any class of people to prevent them from interfering with the business of others.' In Frank v. Herold, 63 N. J. Eq. 443, the court said: 'Now, then, I think it is quite clear from what I have said that these defendants had no right to use the means which are forbidden by the restraining order now brought in question to prevent these operatives from continuing to work for the complainants, and that in doing so they are inflicting an injury upon the complainants, in respect to their private rights, precisely the same as they would if they broke, interfered with or clogged the engine that drove their machinery, and that for such injury the complainants are entitled to a legal remedy by action. Now this being so, the next question is, what right have the complainants here in this court asking for the restraining power of the court? Why, the answer to this is twofold: First, it is quite clear that the relief in damages to be recovered in an action at law is entirely inadequate It is quite absurd to say that they can sue each of these persons, and recover damages against them in separate suits for every little act which in the aggregate tends to result in injury. And, in the second

place, the injury is continuing and irreparable, and
not capable of admeasurement according to legal prin-
ciples. So that at law the remedy is entirely inade-
quate. It is, therefore, a clear case for the interposi-
tion of a court of equity to exercise its preventive
remedy, and that is the particular sphere at this day
of a court of equity, as contradistinguished from a
court of law.' There are many other cases to the same
effect decided in England, and in many of the American
States.''

The Supreme Court of Wisconsin, in the case of
Gatzow v. Buening, 106 Wis. 1. c. 12 to 15, said upon
this subject:

''It is not necessary in this case to decide what
length a combination of persons in restraint of trade,
and interfering with personal liberty, may go to pro-
mote the interests of its members, without violating
common-law rights and rendering such persons liable
to respond in damages to the persons specially in-
jured. Judicial expressions, in recent years at least,
have not been in perfect harmony on the subject. The
only safe course for the public, and legitimate course
for the court, is for it to adhere strictly to the rules
of the common law, both as regards what constitutes
an unlawful conspiracy in restraint of trade, and the
consequences to the guilty parties. So long as that
is the law by which rights in regard to such matters
must be tested, it is not the province of the court to
change, but to administer it.

''The law applicable to this case, as regards the
illegality of the combination in question, was plainly
stated by this court in Milwaukee M. & B. Assn. v.
Niezerowski, 95 Wis. 129. It was there decided that
all combinations in restraint of trade are contrary to
public policy and illegal, unless they are for the rea-
sonable protection, by reasonable and lawful means,
of persons dealing legally with some subject-matter of
contract. A combination that will resort to such means

as the ruthless breaking in upon the solemnities of a funeral ceremony, or that aims to entirely monopolize such an essential to the burial of the dead according to the customs of the country as is usually furnished in cities by liverymen, and to so stifle competition and hamper individual, independent industry in regard to such business as to paralyze individual effort and compel every person, in order to obtain proper facilities for a funeral, to submit to the dictates of the combine, will not stand the test above indicated. Such was the liverymen's union under consideration, by the uncontroverted evidence. Such a combination is clearly unlawful as against public policy, and the means resorted to to effect its purposes in this case were likewise unlawful. It would be hard to conceive of a combination more odiously detrimental to the public interests, and more heartlessly oppressive to individuals, than one that seeks to control the customary means used in the burial of the dead, by the resort to such wanton acts as were perpetrated by the defendants in aid of the purposes of their combination.

"This is an age of trusts and combinations of all sorts. There is clamor against them on the one hand, and for the privilege of combining upon the other, as if the law could be changed to fit the opinions and selfish ends of particular classes. There is clamor for laws to prevent combinations, while law exists that condemns most of them, which is as old as the common law itself, and sufficiently severe to remedy much of the mischief complained of that is actual; yet violations of such law are so common, and the remedy it furnishes so seldom applied, that its very existence seems, in many quarters, to be little understood. In Reg. v. Druitt, 10 Cox, Cr. Cas. 593, it was held that any combination of persons to stifle and prevent the free use of labor or capital within legitimate bound is unlawful, and that the law furnishes a remedy therefor. The liberty of a man's mind and will to say how

he shall bestow himself and his means, his talents, and his industry, is as much the subject of the law's protection as is his body.

" 'A combination to do an act tending necessarily to prejudice the public or oppress individuals by unjustly subjecting them to the power of the confederates and give effect to the purposes of the latter, whether of extortion or mischief, is unlawful.' [2 Bishop, New Cr. Law, sec. 230; Desty, Cr. Law, sec. 11b; Morris Run. C. Co. v. Barclay C. Co., 68 Pa. St. 173.]

"Every agreement between two or more persons to accomplish a criminal or unlawful object, or a lawful object by criminal or unlawful means, is an unlawful conspiracy, and any person whose rights are injured by acts done in furtherance of such conspiracy has his action at law for redress in damages.

"If an unlawful combination exist, it is none the less unlawful because existing under a self-imposed constitution and governed by by-laws, and because it conducts its operations in a public or semipublic way, asserting the right, in pursuit of its purposes, to interfere with individual liberty and with the public interests. In a proceeding for damages for wrong-doing by such a combination to the special injury of an individual, the constitution and by-laws of the association, and protests of its members of innocence of bad intent, and of adherence to the obligations of their association, however innocent may be its name, to prevent incurring its penalties, will constitute no protection whatever, as regards compensatory damages to a person specially injured by overt acts of its members in pursuit of the purpose of the conspiracy.

"The union under consideration is within the condemnation of the common-law rule that a combination of persons, natural or artificial, to restrict legitimate trade or commerce in any field, by hampering or destroying individual liberty, stifling competition, or preventing the exercise of individual freedom to dispose

of one's labor or capital according to his own free will, so long as the legal rights of other persons are not infringed upon, is unlawful. The limitations upon the rule are in the nature of exceptions to it to be shown by way of defense where the combination is shown to exist. If it is not so far-reaching, as regards effects upon the public, or time or place, or the benefits of the members are not so large, as to render the combination an unreasonable interference with trade or individual freedom, that will remove from it the stamp of illegality; yet overt, unlawful acts, by two or more members of the combination acting by agreement to carry out its purposes, will render the combination, as to them, unlawful. The plainest principles of public policy, as before indicated, condemn such a monopoly as was attempted in this case, and the conduct of the defendants to carry out the purposes of the combination was as clearly unlawful.'' [Callan v. Wilson, 127 U. S. 540; State v. Glidden, 55 Conn. 46; State v. Stewart, 59 Vt. 273; Crump v. Commonwealth, 84 Va. 927; Erdman v. Michell, 207 Pa. St. 79; Telephone Co. v. Federation, 156 Fed. 809; Jackson v. Stanfield, 137 Ind. 592; Stove Co. v. Federation, 35 Wash. L. R. 797; Pickett v. Walsh, 192 Mass. 572.]

The same principle was announced by this court in the case of State ex rel. v. Kansas City Live Stock Exchange, 211 Mo. 181.

We might prolong this opinion by citing and quoting from many more of the hundreds of reported cases, where this subject has been discussed by the State and Federal courts of the country, but no wise purpose would be served by doing so, for the reason that they are all in harmony with the views expressed by the various courts above mentioned.

During the oral argument it was suggested by counsel that the case of Clothing Co. v. Watson, 168 Mo. 146, announced views not in harmony with those expressed by the courts in the cases before cited. We

do not so understand that case. By a careful reading of that case it will be seen that the question there discussed was whether or not under the Constitution defendant in that case could be enjoined from publishing a boycott, and it was there held that he could not be so enjoined, but that is not the purpose of this suit. The clear object of this case is to prohibit the defendants from continuing the boycott in force heretofore declared or to enjoin the defendants from declaring a threatened boycott against plaintiff's business, and not to enjoin its publication. If the boycott itself is enjoined, there would be no occasion for complaint against its publication.

Learned counsel for defendants, several times, during the course of the oral argument of this case, asked the question: If a single individual may lawfully do all of the things which are charged against the defendants, then why may not two or more persons agree to do the same things without violating the law?

The answer is plain and simple. Neither the individual nor two or more persons can lawfully conspire to do the things charged. In the first place, the individual cannot do the things charged in the petition at all, either legally or illegally, for the reason he cannot conspire with himself to injure plaintiff's business however well his intention may be to do so; nor can he intimidate the builders from using materials manufactured by plaintiff, for the reason he has no associates bound to him by contract or otherwise with which to intimidate them. It is true, the individual might make up his mind to injure plaintiff's business, and determine in his own mind that he would work such injuries by threatening to no longer work for the builders and contractors if they continued to use materials manufactured by the plaintiff; but the practical working of such an undertaking by an individual would result in most, if not in all, instances in such a small loss to the builders and contractors over and

above the profit they would probably make by continuing to deal with plaintiff, that the threat would have but little or no intimidating effect upon them, and in no manner force them from doing business with plaintiff. Certainly the law would take no notice of such infinitesimal loss nor such slight intimidation. *Lex non curat de minimis.*

But so much cannot be said regarding combinations or conspiracies formed between two or more persons to injure and destroy the business of a person by means of a boycott.

The books are full of cases where such combinations or conspiracies have wrought great injury and loss, and even wrecked and destroyed great and powerful business institutions, and, if left untrammeled, would cause the strongest of them to fall, and the very foundation of our government to crumble.

Such combinations are differentiated from the labor organizations mentioned in paragraph one of this opinion by the fact that they are formed for the direct purpose of protecting and promoting the interests of the laboring classes, which only indirectly and incidentally operate in restraint of trade; while these have for their direct object the immediate effect to injure and damage the business of the persons at whom they are directed, and thereby compel them to discharge the non-union laborers, and thereby indirectly and incidentally protect and benefit the parties to the combination or conspiracy.

All of the authorities permit and encourage the former organizations in carrying out their laudable purposes, but the law with an equally firm hand prohibits all combinations and conspiracies which are formed for the purpose of working injury and damages to the business of another.

We are, therefore, of the opinion that the trial court erred in sustaining the demurrer to the petition.

The judgment is reversed and the cause remanded for a new trial.

All concur.