**BANDAG OF SPRINGFIELD, INC., Plaintiff-Respondent,**

v.

**BANDAG, INCORPORATED, Defendant-Appellant, and Sedalia Bandag Tire & Service, Inc., and Tire Corral, Inc., Defendants.**

**No. 12515.**

Missouri Court of Appeals, Southern District, Division Two.

Nov. 18, 1983.

Motion for Rehearing or Transfer Denied Dec. 14, 1983.

Application to Transfer Denied Jan. 17, 1984.

John C. Monica, Elwood L. Thomas, Laura D. Stith, Shook, Hardy & Bacon, Kansas City, George T. Mobille, Cushman, Darby & Cushman, Washington, D.C., F. William Joyner, Miller, Sanford, Joyner, Westbrooke & Charles, Springfield, for defendant-appellant.

Robert W. Schroff, James W. Newberry, Schroff, Glass & Newberry, P.C., Springfield, for plaintiff-respondent.

HOGAN, Judge.

### I

Plaintiff Bandag of Springfield, Inc., (plaintiff) filed a five-count petition seeking recovery against defendant Bandag, Inc., (Bandag) for: a) breach of contract; b) fraud and misrepresentation, and c) injury and damage by prima facie tort. As grounds for recovery against defendants Tire Corral, Inc., and Sedalia Bandag Tire & Service, Inc., plaintiff averred: a) tortious interference with contract, and b) injury and damage by prima facie tort.

The cause was tried and submitted to a jury against all three defendants. Plaintiff chose to submit its case against Bandag on the ground of prima facie tort only, and against the other defendants solely on the ground of tortious interference with contract. Defendants Tire Corral and Sedalia Bandag had verdicts, but the jury found in favor of plaintiff and against Bandag in the amount of $180,000 as actual damages and $4,000,000 as punitive damages. Bandag appealed.

■ In this court, Bandag has briefed and argued ten diffuse assignments of error. Discussion of each point would produce an opinion of interminable length, and the record, though it is extensive, is insufficient to permit a confident resolution of all the tangential questions tendered. We have therefore focused our attention upon Bandag's assertions that: a) plaintiff's petition failed to state a claim upon which relief could be granted; b) the trial court erred in refusing its motion for directed verdict made at the close of all the evidence, and c) plaintiff made no submissible case.

There is no record indication that the sufficiency of the petition to state a claim was raised before the verdict was received. In such cases, the rule is that the petition will be held sufficient if, allowing reasonable inferences and implications from the facts stated, it advises the defendant with reasonable certainty as to the cause of action it is called to meet and is sufficient to bar another action for the same subject matter. Otherwise put, a petition which imperfectly pleads a claim but is susceptible to amendment to state the claim intended without changing the cause of action is good after verdict. *Davis v. City of St. Louis*, 612 S.W.2d 812, 814 (Mo.App.1981); *Barber v. Allright Kansas City, Inc.*, 472 S.W.2d 42, 44[3, 4] (Mo.App.1971). Plaintiff's averments charging injury by prima facie tort meet these tests.

■ By electing to submit its case against Bandag upon the theory of prima facie tort only, plaintiff abandoned the other pleaded grounds of recovery. *Thaller v. Skinner & Kennedy Company*, 315 S.W.2d 124, 126[1] (Mo.banc 1958); *Carter v. Matthey Laundry & Dry Cleaning Company*, 350 S.W.2d 786, 795[12] (Mo.1961); *Page v. Hamilton*, 329 S.W.2d 758, 762[5] (Mo.1959); *George v. Howard Const. Co.*, 604 S.W.2d 685, 688–91[1][2] (Mo.App.1980).

Therefore, the sole question before this court is whether plaintiff made a submissible case against Bandag under the prima facie tort theory.

### II

#### (Background facts)

#### (A)

The "Bandag Method" is a patented method of reprocessing used tires. It is

called a "retreading" process, but involves the application and bonding of precured rubber to the casing. The product of the Bandag Method is what one ordinarily considers a "recap" but the process is nevertheless consistently referred to as a "retreading" process, and we shall consider it such. Bandag, an Iowa corporation, holds domestic and foreign patent and trademark rights to the process, and what it describes as "extensive detailed know-how" in retreading tires by the Bandag Method. Bandag markets those rights by granting franchises to independent business organizations. This case involves two such franchises.

Bandag grants what are called "exclusive" and "non-exclusive" franchises. An "exclusive" franchise gives the franchisee the right to use the Bandag Method of manufacturing retreads in a prescribed territory. Bandag agrees it will grant no other franchise in the territory described in the agreement. A "non-exclusive" franchise usually allows Bandag to grant at least one other franchise in the prescribed area. Bandag does not, however, grant exclusive marketing rights to any franchisee, because it believes a grant of such rights would be unlawfully anticompetitive. Since 1973, Bandag's franchises have explicitly stated that no exclusive marketing rights are granted. The franchises are granted for a period extending through the term of the last to expire of the Letters Patents and may be terminated only for "good cause."

Plaintiff and the other defendants, Tire Corral and Bandag of Sedalia are closely-held Missouri corporations. Eugene S. (Pat) Haley and Joe Massey are plaintiff's two principal shareholders. Each owns 50 percent of the plaintiff corporation, which was chartered in 1973. Haley and Massey were formerly employed by Bandag; Massey helped to develop the Bandag Method. Haley and Massey were familiar with the Bandag franchising system when they obtained their present franchise in 1973. The counties included in their manufacturing territory include Springfield and a considerable part of the Springfield trade area to the north, south and east of Springfield.

Defendant Tire Corral is a Missouri corporation owned by Nolan Sparks, Jerry Baker and Doyle Collins. This corporation was chartered in 1975; its primary business is the sale of new and reprocessed tires, and before July 1979, Tire Corral sold Bandag retreads "within a hundred mile radius of Springfield." Before defendant Sedalia Bandag was organized, Tire Corral was one of plaintiff's best customers. There was evidence that before Sedalia Bandag was organized, Tire Corral consumed as much as 10 percent of plaintiff's recap output.

By contrivance or by fortuitous but lawful coincidence, Sedalia Bandag was chartered and received its franchise on July 23, 1979; it is a Missouri corporation and Sparks and Collins each own 50 percent of the corporate stock. Both Tire Corral and Sedalia Bandag employ the same corporate counsel and the same accountant; both corporations employ the same registered agent for corporate service. Sparks, Collins and Baker are Tire Corral; Sparks and Collins are Sedalia Bandag. So, if the plaintiff's basic complaint can be summed up in a phrase, it is that Bandag has tortiously misused its economic and perhaps its monopoly power to convert a good customer into a local competitor.

(B)

The circumstances in which Sedalia Bandag was organized and given a franchise must be briefly noted. In 1976, Bandag had entered into a franchise agreement with a Sedalia corporation which was in fact a subsidiary of a St. Louis truck leasing firm. The "exclusive" manufacturing territory assigned to this franchisee included Pettis County and six counties surrounding that county. The general area is just north of plaintiff's exclusive manufacturing area, but is not contiguous to it. The retail marketing areas surround Sedalia, the county seat of Pettis County. Sedalia is about 117 miles north of Springfield.

Sixty-five percent of this franchise's output was consumed by its parent organization. In 1978, the owner of the firm decided to liquidate his business and stop manufacturing retreads altogether. Sparks

heard from another franchisee that the business was for sale and he contacted the owner of the Sedalia business. Desultory negotiations looking to the purchase of the Sedalia organization were conducted for several months by Tire Corral, Bandag and the owner of the Sedalia business. Mr. Loomis, Bandag's Kansas City district manager, actively encouraged Sparks to acquire the Sedalia business. A jury could infer from the evidence that Loomis attempted to conceal the negotiations from the plaintiff, although he had been instructed to keep existing franchisees advised of contacts with prospective dealers.

It is clear that during this period of negotiation—from early October 1978 to July 1979—plaintiff had a valid business expectancy with Tire Corral. It is also clear that from about October 6, 1978, up to the time Bandag of Sedalia was chartered and granted a franchise, Bandag had knowledge of that business expectancy. Tire Corral made application for a franchise as early as October 1978; a "pro forma" (an extrapolative prospectus) was sent forward to Bandag's corporate headquarters in late November or early December 1978. The prospectus is susceptible of the interpretation that Tire Corral expected to purchase $120,000 worth of Bandag recaps in 1979 and perhaps $136,000 worth of such tires in the following year, if the Sedalia franchise were granted to the owners of Tire Corral.

It is beyond cavil that Bandag's grant of a franchise to two of Tire Corral's three owners was an intentional act. Although plaintiff's officers were initially unaware of the prospective transactions, they were later informed of the negotiation by Bandag's corporate president. In April 1979, Massey met two of Bandag's corporate officers at a national convention. Plaintiff's complaints then were much as they are now: Tire Corral was a good customer and plaintiff would lose that customer; the owners of the new franchise were in effective control of Tire Corral, and in consequence, there would be another service-oriented dealer in their territory.

Nonetheless, the corporate process of decision-making proceeded, and the matter eventually came into the hands of Bandag's corporate "franchise committee." Before this committee had reached a decision, plaintiff again objected to granting a franchise to Sparks and Collins. The corporate officer in charge of such matters discussed plaintiff's objections with his committee and with Bandag's attorney, Mr. Mobille. Edwards saw no business reason to deny the franchise; Mobille believed that if Bandag refused to grant Sparks and Collins a franchise on the ground that plaintiff objected, Bandag would be guilty of anticompetitive conduct in violation of federal law. The franchise was granted and this action followed.

## III

### (Applicable procedural principles)

■■■ We cannot overlook the general rule that when the plaintiff's evidence shows he cannot recover as a matter of law, a verdict should be directed. *Rice v. Allen,* 309 S.W.2d 629, 632[4] (Mo.1958); *Overfield v. Garner,* 595 S.W.2d 446, 447 (Mo.App. 1980). Bandag has argued in this court that refusal to grant the "Sedalia" franchise to Sparks and Collins was completely justified because its refusal to do so solely because plaintiff objected would have exposed it to liability for restraint of trade. One can take no exception to Mr. Mobille's advice that giving plaintiff a veto power over prospective franchises would be anticompetitive per se. *United States v. Besser Mfg. Co.,* 96 F.Supp. 304, 311[10] (E.D.Mich. 1951), aff'd, 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063 (1952). The difficulty with this argument as a bar to plaintiff's recovery is that the plaintiff did not seek any such veto power; rather, its complaint was that Bandag singled out and encouraged its best customer to purchase a competing franchise although plaintiff already had many area competitors.

■■■ Further, Bandag's argument cannot be decided on the record presented. The franchises under consideration are in part patent licenses but to establish a "rule

of reason" violation in a patent-antitrust action, a court must consider the peculiar nature of the business in which the restraint is involved, the nature of the restraint and the reasons for its adoption. *Moraine Products v. ICI America,* 538 F.2d 134, 145–46 (7th Cir.1976), cert. denied, 429 U.S. 941, 97 S.Ct. 357, 50 L.Ed.2d 310 (1976). The record is insufficient for us to say with any degree of confidence that either federal or state anticompetitive statutes negated plaintiff's right to recover *as a matter of law.*

■ Otherwise, it is well settled that an appellate court, reviewing an allegation that there is no substantial evidence to support a submission, must view the evidence in a light most favorable to the plaintiff, giving him the benefit of all reasonable inferences to be drawn therefrom. *Smith v. Allied Supermarkets, Inc.,* 524 S.W.2d 848, 849[1] (Mo.banc 1975). The evidence has been so taken and considered. The general rule just recited, however, is subject to the qualification that a case may not be submitted unless there is substantial evidence tending to prove every element of the plaintiff's case, and in the final analysis, submissibility is a question of law for the court. *Gibson v. Newhouse,* 402 S.W.2d 324, 327–28 (Mo.1966); *Probst v. Seyer,* 353 S.W.2d 798, 802 (Mo.1962).

## IV

### (Applicable legal principles)

■ Resolution of the dispositive question before this court requires us to determine whether a defendant's conduct is actionable as a prima facie tort if it would also support submission as a nominate tort. *Porter v. Crawford & Co.,* 611 S.W.2d 265 (Mo.App.1980), cited by both parties, quoted New York authority to the effect, that prima facie tort and a nominate tort may be alternatively *pleaded,* but the court did not reach the question before us. Of necessity our analysis will repeat and reiterate some of what has already been said in *Porter* and *Wilt v. Kansas City Area Transportation Authority,* 629 S.W.2d 669 (Mo.App.1982), both of which were implicitly accepted by our colleagues at St. Louis in *Lohse v. St. Louis Children's Hospital, Inc.,* 646 S.W.2d 130, 131 (Mo.App.1983).

Lord Bowen's dictum in *Mogul Steamship Co. v. McGregor, Gow & Co.,* 23 Q.B.D. 598, 613 (1889), aff'd, 1892 A.C. 25 (H.L.), has been called the "classic statement" of the prima facie tort doctrine. Prosser, Torts 26 (4th ed. 1971). Lord Bowen's statement was:

> "Now, intentionally to do that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that other person's property or trade, is actionable if done without just cause or excuse.... "

*Mogul Steamship Co. v. McGregor, Gow & Co.,* 23 Q.B.D. at 608.

Justice Oliver Wendell Holmes, Jr., is credited with the introduction of the prima facie tort doctrine in this country. *Porter* at 269.[1] Justice Holmes' thesis was that "[T]he intentional infliction of temporal damage, or the doing of an act manifestly likely to inflict such damage and inflicting it, is actionable if done without just cause." Holmes, Privilege, Malice and Intent, 8 Harv.L.Rev. 1, 3 (1894) (footnote omitted). In an ambitious article tracing the historical basis of responsibility for tortious acts, Dean Wigmore classified the prima facie tort as one of four general bases for tort liability. Wigmore, Responsibility for Tortious Acts: Its History, 3 Select Essays in Anglo-American Legal History 474, 475 and n. 1 (1909).[2]

The uncomfortable generality of the prima facie tort doctrine—as a definite theory of recovery—has not escaped criticism. Professor Dan B. Dobbs has recently described the concept as "... [seeming] to be a philosophical effort to state all tort law in

---

1. See also Note, Prima Facie Tort, 11 Cum.L. Rev. 113, 115 and n. 20 (1980); Note, The Prima Facie Tort Doctrine, 52 Col.L.Rev. 503, 504 (1952).

2. See generally Forkosch, An Analysis of The "Prima Facie Tort" Cause of Action, 42 Corn. L.Q. 465 (1957); Note, supra, 52 Col.L.Rev. at 508.

a single sentence rather than an effort to state a meaningful principle." Dobbs, Tortious Interference with Contractual Relations, 34 Ark.L.Rev. 335, 345 (1980). Even so, the prima facie tort doctrine has been given considerable judicial countenance, particularly in those cases we now consider to be "economic" torts, and in labor litigation before that field was preempted by statute.[3] To illustrate, a reasonable research discloses that the prima facie tort concept was held applicable to a case remarkably similar to the case at hand by a divided Minnesota court in 1909. *Tuttle v. Buck,* 107 Minn. 145, 119 N.W. 946 (1909). Although the elaborate and malicious charade considered by the Oklahoma court in *Mangum Electric Co. v. Border,* 101 Okl. 64, 222 P. 1002 (1923), was most certainly an unlawful act, the court undoubtedly relied on the prima facie tort concept in affirming an award of damages for injury to Dr. Border's professional reputation. Id. 222 P. at 1005[3]. And, it was in the context of early labor legislation, rather than in *Porter,* that the prima facie tort notion was first recognized and applied in Missouri. *Lohse Patent Door Co. v. Fuelle,* 215 Mo. 421, 114 S.W. 997, Annot., 22 L.R.A. (n.s.) 607 (1908). In *Lohse,* our Supreme Court held the plaintiff had stated a cause of action by pleading a common-law boycott as an enjoinable tort, buttressing its rationale by quoting extensively from *Barr v. Essex Trades Council,* 53 N.J.Eq. 101, 30 A. 881 (1894), which in turn cited Justice Holmes' article by book and page, and quoted Lord Escher's dictum word for word. Further examples of criticism and approval could easily be cited, but what we have said is sufficient to show that: 1) the prima facie tort doctrine is a subsisting and potentially useful principle, but 2) the broad generality of the concept demands careful formulation and limitation of the constitutive elements of a prima facie tort cause of action if it is to be useful in any way or respect except as a "catch-all" action sounding in tort.

In *Porter,* the court relied heavily upon the case law of New York and the Restatement (Second) of Torts to synthesize a modern, workable form of the prima facie tort cause of action. Such an approach is unexceptionable. The views of the American Law Institute are ordinarily entitled to considerable respect and deference even though they may not be "the law" in any particular jurisdiction, and New York has given the prima facie tort notion its broadest application. The cause of action synthesized in *Porter* consists of the following elements: 1) An intentional, lawful act by the defendant; 2) An intent to cause injury to the plaintiff; 3) Injury to the plaintiff, and 4) An absence of justification or an insufficient justification for the defendant's act. The elements of the prima facie tort cause of action in New York are: 1) The infliction of intentional harm; 2) damage to the plaintiff; 3) lack of excuse or justification; 4) by an act or series of acts which would otherwise be lawful. *ATI, Inc. v. Ruder & Finn, Inc.,* 42 N.Y.2d 454, 398 N.Y.S.2d 864, 866, 368 N.E.2d 1230, 1232 (1977). The elements of the causes of action articulated in *Porter* and in New York are similar. New York requires the allegation and presumably a showing of special damages, Id. 398 N.Y.S.2d at 866, 368 N.E.2d at 1232, and in general, the New York cases have held that the remedy will not lie if plaintiff has a "traditional" or "nominative" tort remedy available. See: *Ruza v. Ruza,* 286 App.Div. 767, 1 App. Div.2d 669, 146 N.Y.S.2d 808, 811[6–8] (1955). As noted, *Porter* did not attempt to decide whether the remedy will lie if plaintiff has a well developed tort remedy available.

Having carefully considered the applicable precedents, we conclude that if, at the close of all the evidence, plaintiff's proof warrants submission under an existing, well-defined nominate tort cause of action, the action may *not* be submitted under the prima facie tort doctrine. We so hold for the following reasons:

---

**3.** Note, Prima Facie Tort Recognized in Missouri, 47 Mo.L.Rev. 553–554, n. 5 (1982); Note, *supra,* 52 Col.L.Rev. at 508–509.

1. If the New York decisions are to be taken as a guide, as *Porter* suggests, it was at one time held in New York that a prima facie tort cause of action could not exist when all the damages sustained were attributable to a specific recognized tort. *Ruza v. Ruza,* 286 App.Div. at 769, 1 App. Div.2d 669, 146 N.Y.S.2d at 810. As noted in *Porter,* the Court of Appeals eased this restriction in *Board of Education v. Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d 397, 380 N.Y.S.2d 635, 343 N.E.2d 278 (1975), as a matter of *pleading.* However, the court went on to expand—and possibly to obscure—the import of its opinion by holding, 38 N.Y.2d at 405, 380 N.Y. S.2d at 645, 343 N.E.2d at 285:

> [O]f course, double recoveries will not be allowed, and *once a traditional tort has been established the allegation with respect to prima facie tort will be rendered academic.* Nevertheless *there may be instances* where the traditional tort cause of action will fail and plaintiff should be permitted to assert this alternative claim. (Our emphasis.)

The imprudence inherent in such open-ended statements of a general principle is demonstrated by the fact that three years later, the Appellate Division felt obliged to hold:

> The just and reasonable concept that the law should never suffer an injury and a damage without a remedy ... has its limitations. To blindly accept this rationale should not be an occasion for setting aside large bodies of case law which have ... set forth the essential elements of traditional tort. *Prima facie* tort should not become a "catch-all" alternative for every cause of action which cannot stand on its legs.

*Belsky v. Lowenthal,* 62 A.D.2d 319, 405 N.Y.S.2d 62, 65, aff'd, 47 N.Y.2d 820, 418 N.Y.S.2d 573, 392 N.E.2d 560 (1979). It is also instructive to note that federal courts in New York, confronted with situations to which either a "nominate" or "traditional" theory or the prima facie tort theory might be applied, have held that a prima facie tort cause of action is not created by conduct which is well within the area of activity meant to be redressed by a traditional tort, especially if the evidence is not, or does not appear to be sufficient to establish a prima facie tort. *Nat. Nutritional Foods Ass'n v. Whelan,* 492 F.Supp. 374, 382–85 (S.D.N.Y. 1980); *Church of Scientology of California v. Siegelman,* 94 F.R.D. 735, 737–39 (1982).

2. The position of the A.L.I., while it is not a model of lucidity, suggests that the creation of a new, or reformulation of an old tort remedy, requires a "balancing of interests." *Porter,* at 270; 4 Restatement of Torts (Second) § 870, comments (c) and (e), pp. 280–81 (1977). The most persuasive comment upon § 870, as far as this panel is concerned, is that part of the comment (c) which reads as follows, and, of course, the emphasis is ours:

> For the established intentional torts, this balancing process has been already worked out and developed in the form of a set of [legal] rules.... The interests of the actor are protected by a set of established privileges, with their individual attributes also established by legal rules. *There is thus no need of using the balancing process afresh for each case in which an established tort exists ....*

The Institute goes on to point out in comment (d) that there are newly recognized categories of intentional tort which are still in the process of development, by implicit inference suggesting that the function of the prima facie tort cause of action should be stated so as to leave room for further development, as was done in *Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d at 405, 380 N.Y.S. at 645, 343 N.E.2d at 284–85.

The dilemma is one of balance, to be sure. A new remedy set in concrete may serve less than its intended function. However, the other approach is much like answering a question with a judicial "perhaps so." If there are categories of legally protectible interests which are now redressed, but inadequately so, the much preferable course is to revise traditional doctrine so as to protect the interest which has gone unprotected. Our Supreme Court did so in *Fischer,*

*Etc. v. Forrest T. Jones & Co.,* 586 S.W.2d 310, 315 (Mo.banc 1979), by making it clear that the cause of action for tortious interference with business relations includes an *expectancy,* as well as a contract relation.

3. We are not alone in our views. Professor Forkosch, whose *analysis of the prima facie tort doctrine* is perhaps the most thoroughgoing study available, believed that "If there is any other traditional tort remedy available, then a *prima facie* tort cause of action should not lie." Forkosch, *supra,* 42 Cornell L.Q. at 481. The New York courts, explaining the "prima facie"—nominate tort distinction, have recently held that by definition, conduct falling within a traditional category of tort is unlawful, therefore prima facie tort applies only to conduct which would be lawful but for defendant's intent to injure the plaintiff and lack of justification for the conduct producing injury. *Burns Jackson Miller Summit Etc. v. Lindner,* 88 A.D.2d 50, 452 N.Y.S.2d 80, 93 (1982).

At least two federal courts purporting to apply Missouri law have suggested or expressly held that a prima facie tort cause of action does not lie if there is an established tort remedy available to the plaintiff. In *Poe v. John Deere Co.,* 695 F.2d 1103 (8th Cir.1982), the court was primarily concerned with the effect of the rule of "issue" or "transaction" preclusion on an attempt to relitigate issues once resolved against the plaintiff. The court did state, however, its understanding of the meaning of "prima facie tort" as a Missouri doctrine. In a footnote, 695 F.2d at 1105, n. 2, the court explained that "This term, (prima facie tort) in Missouri law, seems to include any act intentionally inflicting harm, but not within any traditional tort category." In *Tufts v. Madesco Inv. Corp.,* 524 F.Supp. 484, 486 (E.D.Mo.1981), the District Court, applying Missouri law, reached the conclusion that a prima facie tort case will not lie in this state when the pleaded factual basis for complaint is within the scope of an established tort.

■ To reiterate, the *Porter* analysis, with which we agree, requires proof of an intentional *lawful* act. It is the opinion of this court that if an intentional act has been recognized as being tortious, it cannot be a "lawful" or "privileged" act. Alternative *pleading* of a prima facie tort cause of action is not objectionable, Mo.R.Civ.P. 55.-10, but if at the close of all the evidence, the plaintiff's proof justifies submission of his cause as a recognized tort, the prima facie tort claim may not be submitted.

## V

(Application of the law to the facts)

■ As noted, the controlling principle of appellate review is that a case may not be submitted unless there is substantial evidence tending to prove *every element* of the plaintiff's case. *Gibson v. Newhouse,* 402 S.W.2d at 327–328. Able counsel for the plaintiff has apparently taken the view that because Bandag had the *contractual right* to grant another franchise, then the case could and should be submitted as a prima facie tort. That assumption is unsound; *if* the plaintiff made a case, it is well within the tortious interference with business relations principle, a nominate tort which has been recognized in Missouri since *Downey v. United Weather Proofing,* 363 Mo. 852, 253 S.W.2d 976 (Mo.1953). In *Fischer, Etc. v. Forrest T. Jones & Co.,* 586 S.W.2d at 315, our Supreme Court set out the elements of this cause of action as follows:

(1) A contract or valid business relationship or expectancy . . . ;

(2) Defendant's knowledge of the contract or relationship;

(3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;

(4) The absence of justification; and

(5) Damages resulting from defendant's conduct.

The plaintiff had proof that it had developed a remunerative custom with Tire Corral; its franchise was not revocable at will, but only for "good cause," and a trier of fact could easily have found that plaintiff had a legally protectible expectancy. The evidence would also support a finding that

the defendant knew of this relationship. The pro forma initially furnished to Bandag was sufficient to furnish or charge the defendant with that knowledge. There was abundant proof that defendant *intentionally* induced a breach of that relationship—Bandag's negotiation with Sparks and Collins continued over a period of several months, despite the plaintiff's protest.

It becomes apparent at this point, however, that what plaintiff's evidence established was a series of acts—conduct—*already recognized as tortious* by the law of this state. As we have demonstrated, an act or series of acts which are tortious cannot at the same time be "lawful" or "privileged" acts and it follows that plaintiff wholly failed to prove the intentional *lawful* act which is the first element of the prima facie tort cause of action. For that reason, the judgment must be reversed.

■ We decline to go further and attempt to decide whether plaintiff made a submissible case under the tortious interference theory. When plaintiff amended its pleading to include averments of prima facie tort, it had not been made clear that plaintiff had the burden to prove a lack of, or insufficient justification for the defendant's conduct. It is now clear that such is the law. *Wilt v. Kansas City Area Transportation Authority*, 629 S.W.2d at 672–673[6]. The burden is similarly allocated in tortious interference with contract or expectancy cases. *Cady v. Hartford Accident and Indemnity Company*, 439 S.W.2d 483, 485[3] (Mo.1969); *Wilt*, 629 S.W.2d at 672.

The import of the term "justification" is far from clear, whether one looks to the prima facie tort theory or the tortious interference principle and, in candor, the record is insufficient for this court to decide confidently whether justification as a matter of federal anticompetitive law, or as a simple matter of factual motive, was established. Our research has suggested at least two other broad areas in which plaintiff might pursue its action against the defendant, but it certainly is no part of our function to suggest a remedy to the plaintiff.

Because error was committed, our discretionary power to remand is invoked. *Owings v. White*, 391 S.W.2d 195, 197 (Mo.banc 1965). Believing that plaintiff may have a case and has mistaken its remedy, we therefore reverse and remand. It is so ordered.

MAUS, P.J., concurs.

PREWITT, J., concurs in result.

### ON ALTERNATIVE MOTION FOR REHEARING OR FOR TRANSFER

HOGAN, Judge.

■ The plaintiff has filed a vigorous motion for rehearing or for transfer. At one point, the plaintiff agrees that a prima facie tort cannot be submitted with another theory against the same defendant, but argues that a case under the prima facie tort doctrine was made.

To the extent the motion is a criticism of the manner in which the opinion is rationalized, it may be justified. We wrote as we did because we believe it to be unsound practice to suggest to a plaintiff what the elements of his case are.

We did not, however, overlook other aspects of the sufficiency of the plaintiff's case. Our reading of the record discloses no element of malice; so far as we are able to ascertain from the record, defendant had only a profit motive in granting an additional franchise. Haley testified that he believed defendant granted the franchise to further its own business interests. The record also shows that in response to Haley's objection, Tony Van Ingen and Bill Baird, president of Vakuum Vulk, another retreading process franchised by Bandag, attempted to mollify plaintiff by offering to franchise that process rather than the Bandag method to Sparks and Collins. Inasmuch as the record shows beyond cavil that the defendant had only a profit motive in granting the additional franchise, the element of intentionally seeking to injure plaintiffs, essential to a cause of action for prima facie tort, is lacking. See, e.g., *Fifty*

*States Management Corporation, Etc. v. Niagara Permanent Savings and Loan Association,* 58 A.D.2d 177, 396 N.Y.S.2d 925, 926–927[3] (1977); *Benton v. Kennedy-Van Saun Mfg. & Eng. Corp.,* 2 A.D.2d 27, 152 N.Y. S.2d 955, 957–958 (1956). Uncertainty surrounds the meaning of the "intent to injure" required by *Porter;* some student materials and the Restatement suggest several approaches. Note, supra, 47 Mo.L.Rev. at 557–558. Whatever order of "malice" or "intent" *should* be required, we find none here. To reiterate, it might have been better to rationalize our opinion on this ground. We did not do so because it seemed unfair to saddle plaintiff with a burden not apparent from the cases when it undertook to prove its case.

Admitting that we are profoundly dissatisfied with the concept of "prima facie tort" because we regard it as unworkable, we adhere to our opinion. The motion for rehearing is denied; the application to transfer is denied. If plaintiff believes it is aggrieved, it knows its remedy.