880 P.2d 857

**AETNA FINANCE COMPANY, d/b/a ITT Financial Services, Plaintiff–Counter– Appellant and Cross–Appellee,**

v.

**Robert E. GAITHER, a/k/a Robert Gaither, Neecie Gaither, Frank A. Murray, and Velma Murray, Defendants and Counterclaimants Appellees and Cross– Appellants.**

Nos. 20927, 20994 and 21059.

Supreme Court of New Mexico.

Aug. 3, 1994.

Rehearing Denied Sept. 9, 1994.

Sutin, Thayer & Browne, P.C., Jay D. Hertz, Suann Hendren, Albuquerque, for appellant and cross-appellee.

Frank A. Murray, III, Santa Fe, for appellees and cross-appellants.

## OPINION

FRANCHINI, Justice.

Aetna Finance Company, doing business as ITT Financial Services, appeals from a judgment awarding $26,067.38 in damages and $13,258.77 in costs and attorney's fees to Frank A. and Velma Murray. A jury found that ITT had violated the Unfair Practices Act, NMSA 1978, §§ 57–12–1 to –21 (Repl. Pamp.1987), by knowingly making a statement that was false or misleading to Robert and Neecie Gaither, and that this deception caused the Murrays to lose their interest in a second mortgage they had subordinated to the mortgage ITT held on property the Gaithers were purchasing from the Murrays.

The Murrays cross-appeal from the trial court's refusal to treble the damages award for willful violation of the Act, as provided under Section 57–12–10(B). They also cross-appeal from the court's refusal to award the total amount of attorney's fees requested; and, if this Court reverses the judgment based on the Act, they appeal from the court's dismissal of their causes of action based on prima facie tort and intentional interference with contract, as well as the court's failure to find as a matter of law that ITT's mortgage was inferior to theirs.

Because the evidence does not support a finding that the damages were proximately caused by any deceptive practice or tortious act of ITT and we find that none of the Murrays' arguments on cross-appeal are persuasive, we reverse the judgment.

*Facts and proceedings.* In July 1988, the Gaithers decided to purchase a home from the Murrays for $69,000. The Murrays verbally agreed to accept a down payment of $2000 and carry the balance on a purchase-money mortgage at ten percent interest. The Gaithers went to ITT to borrow the down payment, but ITT refused to lend the $2000. ITT did, however, offer to finance eighty percent of the value of the house at

almost eighteen percent interest on a first mortgage. The house was appraised at $68,900. Eighty percent of $68,900 is $55,120.

The Gaithers and the Murrays executed a purchase agreement under which the Gaithers agreed to make a down payment of $51,000 (by obtaining a first mortgage) and to give the Murrays a second mortgage for $18,000 to secure the balance due. In the contract, the Gaithers agreed to pay all costs associated with mortgage financing. Robert Gaither then obtained what he hoped to be a short-term loan from ITT, planning to seek VA financing on the total value of the house as soon as he and his wife cleared up some credit difficulties. Robert Gaither signed the note and mortgage agreement with ITT; Neecie Gaither signed the note as a witness and did not sign the mortgage. The Gaithers' monthly income was $2135, and the total of the monthly payments under the two mortgages came to $1122.

As a condition to making the loan, ITT required Gaither to pay off an existing ITT loan of over $3700 with the new loan proceeds. Gaither executed a promissory note, secured by a mortgage on the house, for $58,788.11, which amount included monies due the Murrays, prepaid finance charges, the amount due on the outstanding ITT loan, and monies paid to an appraiser. The Gaithers testified, and the jury apparently believed, that ITT assured the Gaithers that it had obtained approval from the Murrays for the additional sums when, in fact, no one at ITT ever discussed the amount of Gaither's obligation to ITT with the Murrays. The Murrays believed that their mortgage was subordinate only to the $51,000 down payment amount they had agreed to in the purchase agreement and were not actually aware of the other amounts added to the loan, even though the mortgage for the greater amount was recorded.

When the Gaithers tried to refinance the house with the VA, they discovered that the VA would not finance an amount that exceeded the value of the house. Unable to make the house payments, the Gaithers defaulted on the promissory notes. In June 1990, ITT filed a complaint to foreclose the mortgages on the property. The Gaithers and the Murrays counterclaimed for unfair trade practices, the Murrays also stating their complaint on alternative grounds of negligence, gross negligence, and prima facie tort. The trial court dismissed all causes of action except those based upon unfair trade practices. The jury returned a verdict finding that ITT had willfully engaged in unfair trade practices against the Gaithers and the Murrays. The jury did not award any damages to the Gaithers, but did award $18,000 on the Murrays' claim. The court added interest to that amount and also awarded costs and attorney's fees, for a total award of $39,326.15 to the Murrays.

After the trial on the legal issue of whether ITT had engaged in unfair trade practices, the court tried the equitable issue of foreclosure and found the Gaithers liable in the principal amount of $57,999.72 plus interest of $28,500.11. At the foreclosure sale, ITT successfully bid $58,000 for the property, which had been appraised in 1990 at $59,350.

■ *The Murrays failed to provide substantial evidence of proximate cause.* Neither ITT nor Gaither had a duty to limit Gaither's loan to $51,000. The Murrays argue they lost the value of their second mortgage because ITT lent the Gaithers almost $8000 more than the amount specified as the down payment in the purchase agreement. They claim that ITT had a duty not to attach its mortgage to more than the amount in the purchase agreement, i.e., more than the value of the house, because it knew that the Murrays had used that amount in agreeing to subordinate their mortgage to ITT's.

Obviously, the Murrays agreed to subordinate their mortgage to at least $51,000 of ITT's first mortgage. The Murrays failed to introduce any evidence, however, to show that had the ITT mortgage been limited to a first priority of $51,000, the Gaithers would have been able either to continue making the payments or to refinance the house. There also was no evidence that the Murrays were willing to buy out the first mortgage after default, to purchase the property at the foreclosure sale, or to exercise their right of redemption. ITT showed that even if the mortgage had been limited to $51,000, the amount of payoff at trial would have been

$70,441.54, which was more than the house's value. Thus, even if ITT had not misrepresented the Murrays' approval, the Murrays still would have lost their mortgage interest. There was no testimony that the Murrays would have been willing or able to tender that amount to regain possession of the house. Because they failed to meet their burden, the verdict and judgment in the Murrays' favor, along with judgment for costs and attorney's fees, must be reversed.

■ *Court properly dismissed the cause of action based on prima facie tort.* Courts are often faced with a suit pleaded under alternative theories of intentional tort, negligence, and prima facie tort. *See, e.g., Schmitz v. Smentowski,* 109 N.M. 386, 391, 785 P.2d 726, 731 (1990) (pleading fraud, negligence, and prima facie tort). The Murrays claim that the trial court erroneously dismissed their claim of prima facie tort against ITT. ITT argues that the trial court properly refused to allow the Murrays to proceed under the theory, citing *Schmitz.*

■ This Court in *Schmitz* relied on two cases, *Bandag of Springfield, Inc. v. Bandag, Inc.,* 662 S.W.2d 546, 552–53 (Mo.Ct.App. 1983), and *Board of Education v. Farmingdale Classroom Teachers Ass'n, Local 1889,* 38 N.Y.2d 397, 380 N.Y.S.2d 635, 643–45, 343 N.E.2d 278, 284–85 (1975), in stating:

> [P]rima facie tort may be pleaded in the alternative; however, if at the close of the evidence, plaintiff's proof is susceptible to submission under one of the accepted categories of tort, the action should be submitted to the jury on that cause and not under prima facie tort. Thus, double recovery may not be maintained, and the theory underlying prima facie tort—to provide remedy for intentionally committed acts that do not fit within the contours of accepted torts—may be furthered, while remaining consistent with modern pleading practice.

*Schmitz,* 109 N.M. at 396, 785 P.2d at 736 (citations omitted). An intentional tort is by definition an *unlawful* act. *Bandag,* 662 S.W.2d at 554. The court in *Bandag* explained that if, at the close of the evidence, the plaintiff had failed to provide proof of an intentional *lawful* act—which distinguishes prima facie tort from traditional intentional torts—prima facie tort could not be submitted to the jury. This principle has long been established in New Mexico by our cases stating that a court may properly refuse to submit a theory to the jury if it is not supported by the evidence. *See, e.g., Fleet Mortgage Corp. v. Schuster,* 112 N.M. 48, 50, 811 P.2d 81, 83 (1991) (affirming summary judgment dismissal of prima facie tort claim where plaintiff failed to present evidence of element of intent); *cf. State v. Akin,* 75 N.M. 308, 312, 404 P.2d 134, 137 (1965) (holding that court properly refused to instruct on an issue for which no evidence was offered).

■ Under the facts of this case, the court properly refused to submit to the jury the Murrays' claim under prima facie tort. One of the elements of prima facie tort is proof that the plaintiff was in fact injured by the unlawful act of the defendant. *Id.* at 394, 785 P.2d at 734. We have concluded that the Murrays failed to present evidence that ITT's acts were a cause of their loss. Therefore, the court properly refused to submit the theory to the jury. *Cf. Fleet Mortgage,* 112 N.M. at 50, 811 P.2d at 83.

■ *ITT's mortgage is not void for lack of Neecie Gaither's signature.* The Murrays contend that their mortgage should be held to be superior to that of ITT because Neecie Gaither did not sign the ITT mortgage. Citing *C & L Lumber & Supply, Inc. v. Texas American Bank/Galeria,* 110 N.M. 291, 295, 795 P.2d 502, 506 (1990), they argue that the exception in NMSA 1978, Section 40–3–13 (Repl.Pamp.1989) (stating that "[e]xcept for purchase-money mortgages ... the spouses must join in all ... mortgages ... to ... mortgage any interest in community real property....") should not apply because not all of the money obtained in the loan was used to purchase the Murray house. *C & L,* however, is distinguishable. There, we held that the purchase-money exception did not apply because "a mortgage executed for the purpose of paying off a land sales contract is itself not a purchase-money mortgage." *Id.* at 296, 795 P.2d at 507. There is no question that the mortgage given to ITT was primari-

250

ly to secure a purchase money loan, although over $3700 was used to pay off a loan of Robert Gaither. To the extent that the mortgage secured purchase monies ($52,130.73 in this case, including the appraisal costs, closing costs and recording fee), the mortgage was a purchase-money mortgage, and was not void for lack of Neecie Gaither's signature.

■ *The court did not abuse its discretion in refusing to allow amendment of the complaint to assert a claim for intentional interference with contract.* At the close of trial, the Murrays moved to amend their pleadings to include a claim for intentional interference with contract. After a hearing, the court denied the request. Although "amendments to pleadings are favored, and should be allowed when justice so requires, ... denial of a motion to amend will be reversed only upon a showing of clear abuse of discretion." *Slide–A–Ride of Las Cruces, Inc. v. Citizens Bank,* 105 N.M. 433, 436, 733 P.2d 1316, 1319 (1987) (citations omitted). The Murrays bear the burden of explaining why justice required allowance of their amendment or in what manner the trial court abused its discretion. Their bald assertion of error by the court is insufficient; "[s]imply alleging an abuse of discretion does not make it so." *Id.* We are satisfied that the court acted within its discretion in refusing to allow the amendment.

*Conclusion.* The judgment in favor of the Murrays is reversed and the trial court is affirmed on the Murrays' cross-appeal.

IT IS SO ORDERED.

MONTGOMERY, C.J., and RANSOM, J., concur.